In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

Mrs. Walter STONER, Oliver Dunn, Jane Smith and John Doe, on behalf of themselves and all others similarly situated, Appellants,

v.

The LTV CORPORATION and LTV Steel Company, Inc., Appellees.

No. 91 Civ. 7182 (MBM).

United States District Court, S.D. New York.

May 14, 1992.

---

sons set forth below, the order of the bankruptcy court is reversed, and the case remanded.

### I.

Appellees are the LTV Corporation, a holding company, and the LTV Steel Company, which after acquisition of Republic Steel in 1984 became the nation's second largest steel producer (collectively "LTV"). On July 17, 1986, appellees, along with 65 other LTV Corporation subsidiaries and affiliates, filed petitions for reorganization pursuant to Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). *See In re Chateaugay Corp.,* 961 F.2d 378, 379 (2d Cir.1992). Since the filing date, the debtors have continued to manage and operate their respective businesses as debtors-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

Burdened with mismanaged and underfunded pension and benefit liabilities, one of LTV's acknowledged objectives in declaring bankruptcy was the restructuring of its employee benefit plans. *See Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 640, 110 S.Ct. 2668, 2673, 110 L.Ed.2d 579 (1990). Thus, upon filing, the debtors-in-possession terminated the life and health insurance benefits of their approximately 78,000 retirees. This unprecedented move provoked an angry response from both organized labor and the general public. *See LTV Cut 'In Flat Violation',* Chicago Tribune, July 29, 1986 at sec. C, pg. 1. The United Steelworkers of America ("USWA") immediately protested the termination by striking LTV mills in Illinois and Ohio and threatening strikes elsewhere. *See* James Risen, *Steel Industry's Woes Mount,* L.A. Times, July 31, 1986 at pt. 4, pg. 1. LTV Steel, already in financial distress and suffering further losses as a result of the USWA action, was forced to petition to resume retiree benefit payments; by Order dated July 30, 1986, the bankruptcy court authorized the limited reinstatement of certain retiree benefits.

Congress also reacted to the termination. On October 18, 1986, Section 608 of Public

Charles T. Riehl, Perry B. Newman, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, Jay R. Indyke, Eric Haber, Siegel, Sommers & Schwartz, New York City, for appellants.

Karen E. Wagner, Ivor Wolk, Davis, Polk & Wardwell, Herbert S. Edelman, Kaye, Scholer, Fierman, Hays & Handler, New York City, for debtors and debtors in possession.

Brian M. Cogan, Lawrence M. Handelsman, Mark S. Wintner, Mark A. Speiser, Nancy A. Markhoff, Stroock & Stroock & Lavan, New York City, for the Committee of Unsecured Creditors of LTV Steel, Inc.

### OPINION AND ORDER

MUKASEY, District Judge.

Appellants, retired former salaried employees of the LTV Steel Company, filed this adversary proceeding to challenge modifications in certain retiree health and welfare benefits. They appeal from an order of the United States Bankruptcy Court for the Southern District of New York (Lifland, C.J.), dismissing the complaint for failure to state a claim and denying their motion for class certification. For the rea-

Law 99–591 ("Section 608"), was enacted to prohibit temporarily the unilateral termination of any plan established for the purpose of providing retiree health and life insurance benefits.[1] *See* Rouse Joint Resolution Making Continuing Appropriations for the Fiscal Year 1987, and For Other Purposes, Title VI, § 608, Pub.L. No. 99–591, 100 Stat. 3341–74 (1986). Congress twice amended this stop-gap provision so that it would remain in effect until October 15, 1987. *See* Pub.L. No. 100–99, 101 Stat. 716 (1987); Pub.L. No. 100–41, 101 Stat. 309 (1987).

In July 1987, while the stop-gap legislation was still in force, the debtors-in-possession moved for an order approving a new collective bargaining agreement with the USWA. The proposed agreement modified a broad spectrum of employee and retiree benefits, and included a new cost-sharing arrangement for retired former USWA employees (hereinafter "hourly retirees" or "union retirees") whereby the union retirees were to contribute $26.82 per month toward the cost of health insurance. (July 8, 1987 App. at 10) According to the debtors-in-possession, the new collective bargaining agreement would promote labor peace, generate an annual savings to LTV Steel of approximately $50 million, and govern the relationship between the debtors-in-possession and the USWA until reorganization was confirmed. (*Id.* at 8) Along with its application for approval of the USWA agreement, LTV Steel also applied for approval of a plan to limit certain health and life insurance benefits paid to retired former non-union employees (hereinafter "salaried retirees" or "non-union retirees"). (*Id.* at 14–15)

The Republic Steel Salaried Retirees' Association ("RSSRA"), a member of the official unsecured creditors' committee, objected to the proposed order. Organized as an Ohio not-for-profit corporation, RSSRA is charged with representing in the bankruptcy proceeding the interests of the approximately 8,000 Republic Steel salaried retirees.[2] In its objection, RSSRA stated:

The Association believes that LTV Steel does not have the right to unilaterally modify or terminate any type of retiree benefits. Consequently, nothing contained in this pleading should be construed as a waiver of any of the retirees' rights.... The Association objects to any unilateral termination or modification of retiree benefits; furthermore, the Association requests that LTV Steel immediately begin consultation with the Association with respect to said retiree benefits.[3]

(July 13, 1987 Res. at 3)

By Order dated July 30, 1987, the bankruptcy court authorized LTV Steel to enter the USWA agreement and modify the salaried retirees' benefits. Despite that approval, the benefit modifications were not immediately implemented because the salaried retirees were still under the protection of Section 608. RSSRA did not appeal the Order.

On October 16, 1987, the day after the stop-gap legislation expired, the debtors-in-possession implemented the modifications approved in the July 30 Order. The new program no longer based death benefits on a percentage of salary at retirement; instead, it provided a maximum of $20,000 face value of life insurance until age 66, declining to $5,000 thereafter. (July 8,

---

1. Section 608 of Public Law 99–591 provides in pertinent part:
    (a) Notwithstanding any provision of chapter 11 of title 11, United States Code, the trustee shall pay benefits until May 15, 1987 to retired former employees under a plan, fund or program maintained or established by the debtor prior to filing a petition (through the purchase of insurance or otherwise) for the purpose of providing medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death.
    (b) This section is effective with respect to cases commenced under chapter 11, of title

11, United States Code, in which a plan for reorganization has not been confirmed by the court and in which any such benefit is still being paid on October 2, 1986.

2. As previously noted, Republic Steel was acquired by LTV Steel in 1984.

3. On July 16, 1987 the RSSRA appeared before the Bankruptcy Court and simply referred the Court to the objections contained in the written response. (July 16, 1987 Tr. at 64)

1987 App. at 15) In addition, appellees allegedly reduced the salaried retirees' health insurance benefits and increased the premiums for such benefits. (Compl. ¶ 11)

On June 16, 1988, the long-awaited Retiree Benefits Bankruptcy Protection Act of 1988 ("Benefits Protection Act") was enacted. Pub.L. No. 100–334, 102 Stat. 610 (1988). The Benefits Protection Act added to the Bankruptcy Code a set of procedures, partially codified at 11 U.S.C. § 1114, which must be followed by debtors seeking to reduce or terminate certain retiree benefits. Section 1114 requires, *inter alia*, that the court appoint a retirees' committee which, by order of the bankruptcy court, serves as the retirees' authorized bargaining representative in benefit negotiations. In addition, although the stop-gap provision technically had expired as of October 15, 1987, Congress included amendments to Section 608 in the Benefits Protection Act. The retroactive effect of these amendments is the central issue in dispute. (*See* II, *infra*)

On October 6, 1988, RSSRA moved for appointment of an official salaried retirees' committee to consist of RSSRA representatives. (October 6, 1988 App. at 8–9; November 30, 1988 Tr. at 7–8) At oral argument in the bankruptcy court, counsel for RSSRA stated that one reason for appointment of that committee would be to allow it to "take into account ... what we would envision to be a prior modification in October of 1987" and "what in effect has been we consider a reviver of stopgap legislation and that fact upon the modification of life insurance issues." (November 30, 1988 Tr. at 26) However, RSSRA did not challenge the October 16, 1987 modifications directly. In denying the application, the bankruptcy court cited the costly proliferation of committees and RSSRA's ability to be heard via the unsecured creditors' committee. (*Id.* at 26–30; November 30, 1988 Order)

On March 9, 1990, LTV Steel sought authorization to make certain payments pursuant to an interim collective bargaining agreement reached with hourly employees and retirees. The interim agreement was entered, according to LTV, because collective bargaining agreements reached between the USWA and several of LTV Steel's leading competitors were undermining "labor peace." The proposed agreement restored earlier wage concessions and improved benefits for hourly retirees; one such improvement was a limit on monthly contributions toward health insurance premiums. (March 9, 1990 App. at 3) RSSRA objected:

> LTV Steel proposes to eliminate the $26.82 monthly health care insurance premium paid by USWA retirees, effective May 1, 1990. This proposal will cost LTV Steel some $11.5 million annually and will provide obvious relief to USWA retirees living on fixed incomes.
>
> LTV Steel's laudable concern for retirees is apparently limited to its USWA retirees, however, since LTV Steel has made no provision or expressed any intention to provide corresponding benefit improvements for Association retirees. At the very least, LTV Steel could have proportioned the proposed premium savings across the entire spectrum of retirees paying such premiums, rather than affording this crucial break to a fraction of all those affected.

(March 15, 1990 Obj. at 3–4; *see also* March 19, 1990 Tr. at 44) In objecting, RSSRA did not challenge the October 1987 reduction as a violation of the Benefits Protection Act. By Order dated March 19, 1990, the bankruptcy court approved the interim collective bargaining agreement.

On November 2, 1990, plaintiffs initiated this action on behalf of themselves and approximately 8,000 other salaried, non-union retirees and their spouses whose benefits had been reduced in October 1987. Plaintiffs allege that the modification of their life and health insurance benefits violated Section 608 as amended by the Benefits Protection Act and 11 U.S.C. § 1114 because the debtors failed to: (1) make a proper proposal to reduce benefits; (2) provide plaintiffs or their authorized representative with adequate information about the reduction; (3) meet with plaintiffs or any authorized representative in a good faith attempt to reach a compromise; (4) demonstrate that the reductions were nec-

essary to prevent liquidation and permit reorganization; and (5) show that the balance of the equities favored the reductions sought. (Compl. ¶¶ 14–15) Plaintiffs allege also that in exit interviews representatives of Republic Steel promised some of the salaried retirees that retirement benefits would not be terminated or reduced and that plaintiffs relied on those promises to their detriment. (Compl. ¶¶ 16–18) Plaintiffs seek a declaration that the debtors-in-possession violated the Benefits Protection Act, and an injunction restoring their benefits.

LTV answered and then moved to dismiss. Plaintiffs cross-moved for class certification. On July 29, 1991, the bankruptcy court dismissed the complaint for failure to state a claim and denied the motion for class certification. On August 7, 1991, the court adopted appellees' Proposed Findings of Fact and Conclusions of Law. The court held that because the contested reductions were made in October 1987, after expiration of Section 608 and before enactment of the Benefits Protection Act, the amendments to Section 608 did not apply. (Findings at 6–8) In addition, the court concluded that because of RSSRA's July 1987 objection to the USWA collective bargaining agreement, its October 1988 motion for appointment of a salaried retirees' committee and its March 1990 objection to the interim collective bargaining agreement, plaintiffs' claims were barred by the doctrines of *res judicata*, collateral estoppel and law of the case. (*Id.* at 8–15) Finally, after noting that the class certification issue was mooted by dismissal of the complaint, the court nevertheless found that plaintiffs failed to meet the certification requirements of Fed. R.Civ.P. 23. Plaintiffs appeal both dismissal of their complaint and denial of their motion for class certification.

## II.

■ Appellees' July 1986 termination of retiree benefits and the subsequent labor unrest and public outcry, provoked an immediate Congressional response. *See, e.g.,* Editorial, *Out in the Cold,* L.A. Times, Sept. 9, 1986 at pt. 2, pg. 4. On July 29, 1986, 46 members of the House of Representatives introduced a bill to prohibit the unilateral termination of retiree benefits. H.R. 5283, 99th Cong., 2d Sess. (1986). A similar bill passed the Senate on July 30, after introduction by Senators Metzenbaum and Heinz on July 25, eight days after the LTV termination. S. 2690, 99th Cong.2d Sess. (1986). Addressing the Senate on the day S. 2690 passed, Senator Metzenbaum said:

This is the largest bankruptcy filing in U.S. history in terms of company size, and debts. It halts payments of $4 billion to more than 20,000 creditors. LTV Steel is the second largest steel manufacturer, a major defense contractor, and the 43d largest industrial company in the country.

[I]n an unprecedented move the day after filing its petition, the company suspended health and life insurance benefit coverage to its retirees. . . .

[O]ur bankruptcy laws are intended to protect a company from its creditors in order to give it an opportunity to reschedule its debts—to reorganize in order to become a viable company. Our bankruptcy laws are not intended to permit companies to terminate their health and life insurance promises to retirees.

LTV has not negotiated with the retirees. Instead, it has unilaterally terminated their health benefit coverage.

132 Cong.Rec. S 9880 (daily ed. July 30, 1986). In remarks immediately preceding the vote, Senator Heinz expressed his belief that the proposed legislation would provide "substantial relief to all of those employees, former employees, and retirees of LTV whose medical benefits were cut off [and] corrects what would be, I believe, an irresponsible, unfair and unwelcome action." *Id.* at S 9881; *see also Id.* at S 9879–81 (statements of Sens. Specter, Durenberger and Byrd). The result of this effort was the enactment in October 1986 of Section 608, which temporarily prohibited unilateral modification of retiree benefits and, despite its general applicability, was "[a]imed primarily at [the] LTV Corporation." *Spending Bill Includes Senate Language Temporarily Protecting LTV*

*Retiree Benefits,* Daily Lab.Rep. (BNA) No. 202, at A–11 (October 20, 1986).

Congress extended the stop-gap protection contained in Section 608 until September 15, 1987, Pub.L. No. 100–41, 101 Stat. 309 (1987), and again until October 15, 1987. Pub.L. No. 100–99, 101 Stat. 716 (1987). After he signed the extensions, President Reagan noted that Congress passed Section 608 and the extensions "for the express purpose of 'freezing' the *status quo,* while it considered permanent amendments of the Bankruptcy Code in the area of pension benefits." 23 Weekly Compilation of Presidential Documents 536, May 18, 1987.

Perhaps because LTV had agreed to a cost-sharing arrangement with union retirees (July 8, 1987 App. at 10), Congress allowed the stop-gap protection provided by Section 608 to lapse on October 15, 1987. The next day, in accordance with the July 30, 1987 Order of the bankruptcy court, appellees reduced the benefits paid to salaried, non-union retirees.

The permanent amendments to the Bankruptcy Code were not enacted until the Benefits Protection Act was signed into law on June 16, 1988, eight months after expiration of Section 608. Pub.L. No. 100–334, 102 Stat. 610 (1988). The Benefits Protection Act, as codified at 11 U.S.C. § 1114, classifies retiree benefit payments as administrative expenses under 11 U.S.C. § 503, and prohibits modification of such benefits unless the debtor satisfies certain criteria.[4] Specifically, the trustee must make a proposal to the appointed committee of retirees or other authorized representative, provide all necessary information to the authorized representative and confer in good faith in an attempt to reach a mutually satisfactory modification of benefits. 11 U.S.C. §§ 1114(d), (e), (f). The court may enter an order modifying retiree benefits if the court finds: (1) the trustee made a good faith proposal; (2) the autho-

rized representative refused to accept such proposal without good cause; and (3) such modification is necessary to permit reorganization and is favored by a balance of the equities. 11 U.S.C. § 1114(g). At any time after a modification is made the retirees' authorized representative may apply to the court for an order increasing retiree benefits. *Id.* The Benefits Protection Act specifies that § 1114 applies to cases commenced after June 16, 1988. *See* Benefits Protection Act § 4(b). Section 1114, therefore, does not apply to the LTV bankruptcy.

However, in addition to promulgating § 1114, the Benefits Protection Act amended Section 608. *See* Benefits Protection Act § 3. Like § 1114, those amendments forbid a court from modifying benefits unless a proposal is made to the retirees' authorized representative, the necessary information is provided for evaluation of that proposal, the modification is necessary to permit reorganization and a balance of the equities favors the modifications. *See* Benefits Protection Act § 3(C)(2)(b). The amendments, which apply to pending cases, were effective upon enactment. *See* Benefits Protection Act § 4(a). The question here is whether in pending cases the amendments apply to modifications made between the lapse of Section 608 and the enactment of the Benefits Protection Act, or whether they apply only to modifications made after the effective date of the Benefits Protection Act.

Absent specific statutory language, it is unclear from the current state of the law whether a statutory amendment applies retroactively in a pending case. In *Bradley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the Supreme Court held that "a court [on direct review] is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest

---

**4.** 11 U.S.C. § 1114(a) provides:

"[R]etiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or

benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

injustice or there is statutory direction or legislative history to the contrary." [5] In apparent tension with the *Bradley* rule, however, is the Court's later pronouncement that "[r]etroactivity is not favored in the law.... [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). In *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court acknowledged the apparent conflict between *Bradley* and *Bowen* but declined to resolve it. In *Kaiser Aluminum* the Congressional intent was clear and, as Justice O'Connor noted, "under either view, where the Congressional intent is clear, it governs." *Id.* at 837, 110 S.Ct. at 1577.

Here, it is clear that Congress intended to protect the members of the plaintiff class. As discussed above, the purpose of Section 608 was to provide relief to *all* LTV retirees; no distinctions were drawn between union and non-union retirees or between salaried and hourly retirees. *See, e.g.,* 132 Cong.Rec. S 9881 (daily ed. July 30, 1986) (statement of Sen. Heinz). In addition, the stated purpose of the extensions was to maintain the *status quo* until permanent legislation was enacted. 23 Weekly Compilation of Presidential Documents 536, May 18, 1987; 134 Cong.Rec. 12,699 (1988) (statement of Sen. Heinz).

The legislative history of the Benefits Protection Act establishes also that the amendments to Section 608 were intended to protect retirees in pending cases, and in particular LTV retirees, from benefit reductions. After mentioning the LTV bankruptcy, the Senate Report on the Benefits Protection Act noted that the retirees covered were "those who received their insurance benefits pursuant to collective bargaining agreements, and those who received those benefits pursuant to non-collectively bargained plans." S.Rep. No. 119, 100th Cong., 2d Sess. 1 (1988), U.S.Code

Cong. & Admin.News 1988, p. 683. Moreover, it appears from numerous statements in Congress, only a representative sample of which can be provided here, that the protections contained in the Benefits Protection Act were intended to apply to all modifications or proposed modifications made after October 2, 1986 and to both union and non-union retirees. For instance, Senator Metzenbaum explained:

[The Benefits Protection Act] differs in some respects for pending cases. However, these differences do not reduce the substantive protection afforded retirees.

\* \* \* \* \* \*

[The amendments to Section 608 are] effective with respect to cases commenced under chapter 11 prior to October 2, 1986, in which a plan for reorganization has not been confirmed by the court and in which any benefit to retired former employees as defined in section 608(a), is still being paid on October 2, 1986.

Thus, section 608, with the amendments added by this legislation, applied to cases commenced under chapter 11 where any retiree is being paid such a benefit on October 2, 1986, even if some or most of the retirees had their benefits eliminated by the debtor prior to that date. In such situations, the debtor would be required to reinstate those benefits which had been eliminated prior to October 2, 1986, to reimburse retirees for any benefits lost as a result, and to continue to provide the benefits until section 608 as amended allows otherwise.

134 Cong.Rec. 12,699 (1988). In the House of Representatives, Representative Edwards, speaking for Representative Rodino, Chairman of the House Judiciary Committee, noted that the Benefits Protection Act applied to both salaried and hourly employees and to benefit modifications made in pending cases:

In its application to pending cases, this bill differs somewhat in form from the

---

5. The Second Circuit recently applied *Bradley* in *United States v. Colon,* 961 F.2d 41, 45 (2d Cir. 1992).

Senate version but provides equivalent protection. Section 3 protects both union and non-union retirees in pending cases by modifying and making permanent section 608 of Public Law 99–591, the temporary legislation that Congress enacted in 1986.

Section 3(a) modifies Public Law 99–591 so that the same provisions regarding the payment of benefits in future chapter 11 cases apply to pending cases. *Id.* at 11,938.

Thus, the legislative history of both Section 608 and the amendments to that section demonstrates that Congress intended to protect all retirees, whether those retirees were union or non-union workers, whether they were affected by new or pending filings, and whether the modifications were made before or after passage of the Benefits Protection Act. As the remarks of the legislators suggest, Congress specifically sought to help the 78,000 retirees whose benefits were jeopardized as a result of the LTV bankruptcy. To that end, the statutory scheme was designed to provide interim protection until permanent legislation could be agreed upon. It is inconceivable that, despite its repeated efforts to protect all LTV retirees from benefit reductions, Congress intended to allow plaintiffs to slip through a legislative crack.

Appellees point out that Congress failed to extend the stop-gap protection provided by Section 608 and that a literal application of the statutes requires that the amendments be applied only to benefit modifications which took effect after July 16, 1988. But this argument ignores the rule that in construing a statute a court must consider "not only the plain meaning of the language used in the statute, but the purposes Congress sought to serve by promulgating the relevant law." *United States v. Matteo*, 718 F.2d 340, 341 (2d Cir.1983). The Supreme Court has recognized that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *United*

*States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *see also In re Chateaugay Corp.*, 920 F.2d 183, 184 (2d Cir.1990). Courts, therefore, may and should examine legislative history to determine a statute's purpose and then apply that purpose, if the plain meaning would produce an "unreasonable" result "plainly at variance with the policy of the legislation as a whole...." *United States v. American Trucking Assos.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *see also Korea Shipping Corp. v. New York Shipping Ass'n*, 880 F.2d 1531, 1537 (2d Cir.1989) (declining to adopt dictionary meaning of "employer" in applying ERISA because adopting that meaning would make pension plans "victims of the precise threat Congress aimed to shield them from").

These principles of statutory construction were applied by the Second Circuit in an analogous situation in *In re Adamo*, 619 F.2d 216 (2d Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980). Before the *In re Adamo* debtors declared bankruptcy, discharge of student loan indebtedness was prohibited; however, the relevant code provision was repealed and a new, more comprehensive provision which also prohibited discharge, was signed into law to become effective some 11 months later. During the period between repeal of the prior law and the effective date of the new legislation, the debtors attempted to discharge their student loan obligations. In holding that discharge was impermissible, the Second Circuit stated:

We conclude that the hiatus between the repeal of [the old provision] and the effective date of its successor ... was purely a manifestation of congressional inadvertence and that to follow blindly the plain meaning of the statute without regard to the obvious intention of Congress would create an absurd result in accord with neither established principles of statutory construction nor common sense.

*Id.* at 219; *see also In re Williamson,* 665 F.2d 683 (5th Cir.1982) (following Second Circuit in applying student loan provisions).

Here, as in *In re Adamo,* there is direct evidence that Congress' failure to extend Section 608 was inadvertent. For instance, speaking in favor of passage of the Benefits Protection Act, Senator Heinz stated:

LTV's threatened termination moved the Senate to action, and within a very short time we had passed legislation to prevent the termination of retiree health and life insurance plans by bankrupt companies while Congress considered reform legislation. This temporary provision was continued *for almost 2 years* while we worked on the bill that is before us now.

134 Cong.Rec. 12,700 (1988) (emphasis added). However, Section 608 was in effect for less than a year before Congress allowed it to lapse. Thus, Senator Heinz, a sponsor of both Section 608 and the Benefits Protection Act, was laboring under the mistaken belief that Section 608 remained in force until the permanent legislation took effect.

No less persuasive is the indirect evidence in the legislative history of both Section 608 and the Benefits Protection Act. As President Reagan, Senator Heinz, and Chairman Rodino among others, noted at the time, the purpose of the interim legislation was to protect retirees while Congress considered permanent amendments to the Bankruptcy Code. *See* 23 Weekly Compilation of Presidential Documents 536, May 18, 1987; 134 Cong.Rec. 12,700 (1988) (statement of Senator Heinz); *Id.* at 11,938 (statement of Representative Rodino). Moreover, the amendments to Section 608 contained in the Benefits Protection Act were passed specifically to provide similar protection in pending cases to that provided by § 1114 in newly filed cases. 134 Cong. Rec. 12,699 (1988) (statement of Senator Metzenbaum). To conclude now that the failure to extend the stop-gap legislation was a purposeful act meant to expose plaintiffs to unilateral benefit reductions would be to ignore the weight of legislative history and to discern a Congressional intent to protect non-union retirees in these proceedings from October 1986 through October 1987, to neglect them until June 16, 1988, and then to provide protection thereafter. It would be perverse to read the statute to require that result. *See In re Adamo,* 619 F.2d at 222 (and cases cited therein). When literal application "compel[s] an odd result," *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989), that in itself suggests that the words were not meant to be applied as written. Judge Learned Hand counseled that "a mature and developed jurisprudence [should] not make a fortress out of the dictionary ...", *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945); neither, in this instance, should it make a moat out of the calendar.

I conclude therefore that the amendments to Section 608 contained in § 3 of the Benefits Protection Act, apply to the modifications challenged in plaintiffs' complaint.

### III.

The bankruptcy court found that plaintiffs' claims were barred by *res judicata* because of decisions in three proceedings in which RSSRA appeared as representative of the salaried retirees. Specifically, the bankruptcy court relied on its decisions (i) granting LTV Steel's July 1987 application for approval of the USWA collective bargaining agreement, (ii) denying RSSRA's October 1988 motion to authorize appointment of an official salaried retirees' committee, and (iii) granting LTV Steel's March 1990 application for approval of the successor collective bargaining agreement.

■ The doctrine of *res judicata* precludes litigation if a prior decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case between the same parties or their privies, and (4) involving the same cause of action. *In re Teltronics Services, Inc.,* 762 F.2d 185, 190 (2d Cir.1985). The judgment terminates the cause of action which thereafter cannot be relitigated, *Nevada v. United States,* 463 U.S. 110, 130, 103 S.Ct. 2906,

2918, 77 L.Ed.2d 509 (1983), and "prevents litigation of a matter that could have been raised and decided in a previous suit, whether or not it was raised." *Murphy v. Gallagher*, 761 F.2d 878, 879 (2d Cir.1985).

■ In some instances, mechanical application of the preclusion doctrines can deprive a litigant unfairly of his opportunity to be heard. *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333–34, 91 S.Ct. 1434, 1445–46, 28 L.Ed.2d 788 (1971). As the Supreme Court has explained:

> Because *res judicata* may govern grounds and defenses not previously litigated ... it blockades unexplored paths that may lead to truth. For the sake of repose, *res judicata* shields the fraud and the cheat as well as the honest person. It therefore is to be invoked only after careful inquiry.

*Brown v. Felsen*, 442 U.S. 127, 132, 99 S.Ct. 2205, 2210, 60 L.Ed.2d 767 (1979). Here, such inquiry must be undertaken with consideration for the equitable nature of the proceedings. *See Margolis v. Nazareth Fair Grounds & Farmers Market, Inc.*, 249 F.2d 221 (2d Cir.1957) (applying *res judicata* in bankruptcy). In applying the Bankruptcy Code courts must adhere to the general principles and practices of equity, *see Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and are charged with preventing injustice and unfairness in adjudicating the affairs of the bankrupt estate. 11 U.S.C. § 105(a).

■ The first of the three proceedings was the bankruptcy court's July 1987 approval of the proposed collective bargaining agreement. Appellees argue that because LTV Steel applied for permission to modify retiree life insurance benefits, any and all objections to such modification should have been raised in response to that motion. (*See* July 8, 1987 App. at 14–15) In fact, RSSRA did object to the reduction in life insurance benefits arguing that "LTV [did] not have the right to unilaterally modify or terminate any type of retiree benefits." (July 13, 1987 Res. at 3) However, at the time, RSSRA could not have predicted what would be required of a debtor seeking to modify retiree benefits as part of the permanent legislation and whether such legislation would apply retroactively; therefore, RSSRA could not have objected to the October 1987 reductions on the grounds raised in plaintiffs' complaint. Even assuming without deciding that RSSRA and plaintiffs are in privity, plaintiffs cannot now be denied their opportunity to be heard because their representatives failed to raise issues not then in dispute or which were not reasonably foreseeable at the time. *See Harborside Refrigerated Services, Inc. v. Vogel*, 959 F.2d 368, 373–74 (2d Cir.1992); *In re Lincoln Plaza Towers Assoc.*, 6 B.R. 808, 812 (Bankr. S.D.N.Y.1980) (claim not barred after a "material and intervening legislative change in the law").

■ The March 1990 decision on LTV Steel's application for approval of the successor collective bargaining agreement is without preclusive effect because it did not address the same claims or causes of action as those raised in plaintiffs' complaint. A cause of action is identical for *res judicata* purposes only if the same transactions or series of transactions are at issue, the same evidence is necessary to support both claims, and the facts essential to the second claim were present in the first. *N.L.R.B. v. United Technologies Corp.*, 706 F.2d 1254, 1259–60 (2d Cir.1983); *see also Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 874 (2d Cir.1991) ("the test for deciding sameness of claims requires that the same transaction, evidence and factual issues be involved").

Here, the plaintiffs' complaint arises from a transaction distinct from the one addressed in the prior decision. The March 1990 application was a response to threatened labor unrest and the prevailing labor market conditions. (*See* March 9, 1990 App. at 3) In contrast, the retiree benefits issue arises in response to Congressional action, the needs of the retirees and alleged promises made to the salaried retirees by officers of Republic Steel.

■ In addition, and perhaps as a consequence, the modification issue requires that a fact finder consider several issues not raised by the earlier application. For instance, in considering a proposed modification of retiree benefits the bankruptcy court must consider the financial effect of the modification, the objections of various creditors and committees, and the proposed plan for implementing the modification. These issues were not raised by the debtors in their March 1990 application for approval of the successor collective bargaining agreement. Thus, regardless of the basis for RSSRA's objection, resolution of the benefits issue would have required a separate application and adequate opportunity for the interested parties to prepare and respond. If the reasoning of the bankruptcy court were carried to its logical conclusion, once an application is made regarding a labor issue, all wage and benefit issues must be decided as a result of that application or the interested parties will forever lose their opportunity to be heard. That is both impracticable and contrary to the rule that *res judicata* applies only when the same transactions and factual issues are raised. *Sure–Snap Corp.*, 948 F.2d at 874.

■ Nor does preclusive effect arise from the bankruptcy court's denial of RSSRA's application for appointment of a salaried retirees' committee. (*See* October 6, 1988 App.) Although the issue of the October 1987 reduction in retiree benefits was raised in the application and during the hearing, that reduction was not directly challenged at the time. Instead, it was raised as one of the issues requiring appointment of a retirees' committee. As appellees note in their brief: "In a hearing on November 30, 1988, counsel for RSSRA emphasized that one of the reasons for the appointment of such a committee would be to 'take into account ... what we would envision to be a prior modification in October of 1987', and 'what in effect has been we consider a reviver of a stopgap legislation and that fact upon the modification of the life insurance issues.'" (Appellees Br. at 6) Similarly, counsel for RSSRA stated in oral argument before the bankruptcy court that: "What in essence we are seeking here today is not so much an Order of this Court determining the effect of the stopgap legislation on the retirees, but merely the appointment of a Committee which would then continue on a procedure of negotiation with the Debtors in an attempt to reach a resolution of what effect the revived stopgap legislation has." (November 30, 1988 Tr. at 8) As a result, the bankruptcy court did not decide whether the October 1987 benefit reduction violated Section 608 as amended; rather, it focused only on whether the salaried retirees needed an additional committee, but recognized that the issue of retiree benefits could be raised in the future. (Nov. 30, 1988 Tr. at 26–30)

It is "familiar law that only a final judgment is *res judicata*." *G & C Merriam Co. v. Saalfield*, 241 U.S. 22, 28, 36 S.Ct. 477, 479, 60 L.Ed. 868 (1916). For an order of a bankruptcy court to be considered final "it must contain 'a final decision on the discrete issue at bar.' An order is final if it resolves and terminates some aspect of the proceedings and irrevocably decides the rights of any party or a dispositive issue of law." *In re Chateaugay Corp.*, 64 B.R. 990, 996 (S.D.N.Y.1986) (quoting *In re Stable Mews Assoc.*, 778 F.2d 121, 122 (2d Cir.1985)). Denial of committee status does not decide the substantive issues such a committee would have addressed. The Second Circuit, after noting that the finality requirement traditionally has been liberally applied in the bankruptcy context, nevertheless held that denial of committee status does not constitute a final order: "Orders denying ... requests for official committee status do not resolve particular disputes within the overall bankruptcy case; they simply affect the committee structure within which various disputes in the reorganization proceeding will be considered." *In re Johns–Manville Corp.*, 824 F.2d 176, 180 (2d Cir.1987).

■ When it denied RSSRA's motion, the bankruptcy court did state that "[a]bsent a trigger under the new legislation" it need not appoint a committee (November 30, 1988 Tr. at 27). That statement, however, was not a ruling on whether the

Section 608 amendments apply to the modifications which are the subject of plaintiffs' complaint. Section 3 of the Benefits Protection Act, which amends Section 608 and applies to pending cases such as the one at hand, does not require appointment of an official committee; appointment of a committee is required only in cases filed after July 16, 1988. *See* 11 U.S.C. § 1114; Benefits Protection Act § 4(b). Therefore, the bankruptcy court's statement that the committee requirement had not been triggered was simply an acknowledgement that 11 U.S.C. § 1114 does not apply to this case. That statement did not decide the retroactive effect of the amendments to Section 608 because the amendments were not implicated by the motion to appoint a retirees' committee.

In fact, during oral argument, counsel for RSSRA asked for the committee not as a consequence of the amendments, but for the purpose of determining the effect of those amendments on the LTV case and as an alternative to resolving the issue in an adversary proceeding brought by the retirees. (November 30, 1988 Tr. at 8–9) Thus, the amendments to Section 608 were not at issue, and the decision not to appoint a retirees' committee was based solely on whether 11 U.S.C. § 1114 applied and whether there was an administrative need for the proposed retirees' committee. As the court itself implicitly recognized by granting RSSRA leave to bring another such motion should there be a change in factual circumstances (*Id.* at 30), the decision did not constitute a final order resolving the substantive issues the committee would have addressed. *See In re Johns–Manville*, 824 F.2d at 180. Therefore, denial of RSSRA's application for committee status is without preclusive effect. *Milltex Industries Corp. v. Jacquard Lace Co.*, 922 F.2d 164, 167 (2d Cir.1991) ("*res judicata* applies only to a final judgment on the merits").

Because the three proceedings at issue did not embrace plaintiffs' current claims, dismissal on the grounds of *res judicata* was unwarranted.

## IV.

Relying on the three appearances by RSSRA, the bankruptcy court also held plaintiffs' complaint barred by collateral estoppel and the doctrine of law of the case. (Findings at 13–15)

Collateral estoppel applies to prevent relitigation of issues previously litigated and decided. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). A party is estopped to relitigate an issue only if: (1) the issues in both proceedings are identical; (2) the issue in the prior proceedings was actually litigated and actually decided, (3) there was a full and fair opportunity to litigate the issue in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *In re PCH Assoc.*, 949 F.2d 585, 593 (2d Cir.1991); *see also Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). The bankruptcy court did not specify the issues it concluded were barred by collateral estoppel. However, the operative issues raised by plaintiffs' claims were neither actually litigated and decided nor necessary to a final judgment on the merits in any of the three matters in which RSSRA entered an appearance.

As to the first matter, the bankruptcy court's disposition of the July 1987 application for approval of the USWA collective bargaining agreement did not resolve whether the October 1987 benefit reductions violated Section 608. Although the court approved the debtors' reduction of retiree benefits, the debtors' failure to effect that reduction until Section 608 technically expired on October 15, 1987 shows no one disputed that Section 608 applied to block the modification while it remained in force. In any event, issues as to the applicability and effect of the amendments to Section 608 could not have been decided because the Benefits Protection Act had not yet been passed.

Regarding the October 1988 motion for appointment of a retirees' committee, as noted above, no final order resolving the issues raised by plaintiffs' com-

plaint was entered in connection with that motion. A party is not collaterally estopped to raise an issue unless a decision on that issue was necessary to a final judgment on the merits. *See In re PCH*, 949 F.2d at 593. Moreover, the effect of Section 608 as amended by the Benefits Protection Act was not a basis for the bankruptcy court's decision; therefore, that decision does not now estop plaintiffs' to raise the issue. *See Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 728 (2d Cir.1981).

■ Finally, approval of the March 9, 1990 interim collective bargaining agreement did not require resolution of any issues raised in plaintiffs' complaint. RSSRA did object on the grounds that additional funds should be devoted to non-union retiree benefits. However, approving the interim collective bargaining agreement did not require a decision on whether the October 15, 1987 benefit modification was illegal and, therefore, that approval cannot act to prevent plaintiffs from disputing the reduction of benefits. *See Id.*

■ The law of the case doctrine holds only that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *United States v. Yonkers Bd. of Educ.*, 856 F.2d 7, 11 (2d Cir.1988). The law of the case will be followed unless there is " 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Doe v. New York City Dep't of Social Services*, 709 F.2d 782, 789 (2d Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). In other words, "to the extent that the law of the case doctrine exists in federal court, it is a prudential and not a mandatory rule." *Higgins v. California Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir.1924).

The bankruptcy court concluded that its decisions on the three motions—the July 1987 application for approval of the USWA collective bargaining agreement, RSSRA's October 1988 motion for appointment of a retirees' committee, and the March 1990 application for approval of the successor collective bargaining agreement—constitute law of the case and bar plaintiffs' complaint. However, as discussed above, whether the October 15, 1987 benefit reduction violated Section 608 as amended by the Benefits Protection Act was never decided: the July 1987 application was made before enactment of the amendments, the issue was not a basis for the court's denial of RSSRA's October 1988 application for appointment of a retirees' committee, and the issue was not resolved as part of the bankruptcy court's decision approving the interim collective bargaining agreement in March 1990. Thus, there is no law of the case controlling the issues raised by plaintiffs' complaint.

## V.

After noting that the class certification issue was mooted by its dismissal of the complaint, the bankruptcy court nevertheless stated that plaintiffs failed to meet the requirements for class certification set forth in Fed.R.Civ.P. 23. The court concluded that "plaintiffs' claims are based on alleged promises made at 'exit interviews' " and the necessity of proving that such promises were made violates the commonality and typicality requirements of Fed.R.Civ.P. 23. (Findings pp. 15–16)

■ In so holding, the bankruptcy court mischaracterized plaintiffs' claims. Although one of the claims is based on promises to maintain benefits, the other alleges that the reduction in benefits violated Section 608, as amended. As to that claim, all salaried retirees are similarly situated and there is a single question—whether the October 15, 1987 reduction violated the statute—common to all members of the class.

■ The second claim, based on promises made at exit interviews, does not require denial of class status. Rule 23(b)(3) requires only that common issues predominate over individual issues.

"In general, a Rule 23(b)(3) action is appropriate whenever the actual inter-

ests of the parties can be served best by a single action.... [T]he proper standard under Rule 23(b)(3) is a pragmatic one, which is in keeping with the basic objectives of the Rule 23(b)(3) class action. Thus, when common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than an individual basis."

*In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 722 (E.D.N.Y. 1983) (quoting 7A C. Wright & A. Miller, M.K. Kane, *Federal Practice and Procedure* §§ 1777, 1778 (1972)). Here the crucial question raised by the litigation is whether the October 1987 benefit reduction violated Section 608 as amended; that issue is common to all members of the class. Because the relief sought under both the statutory and contract claims is the same, resolution of the common issue in favor of plaintiffs will obviate the need to decide the contract issue. A decision in favor of defendants will prevent inconsistent adjudication on that issue and allow each of those who have contract claims to pursue those claims individually without having to litigate the common claim. *See Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968) ("The effective administration of Rule 23[ ] will often require the use of the 'sensible device' of split trials."), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Therefore, certification is practical and in accord with the purpose of Rule 23.

\* \* \*

For the reasons stated above, the bankruptcy court's order dismissing plaintiff's complaint and denying class certification is reversed. The complaint is reinstated, the class certified, and the action remanded.

SO ORDERED.