IRVING R. KAUFMAN, Circuit Judge:
Restraining litigious plaintiffs from taking more than “one bite of the apple” has been our avowed purpose since the common law doctrine of res judicata first evolved. The question before us today is whether “having one’s day” in bankruptcy court precludes the bringing of lender liability claims against the debtor’s creditors in a separate, tort-based suit. The timeworn test of sameness of claims, based on transactional, factual, and evidentiary similarity, indicates these claims should have been brought in the original bankruptcy proceeding, as they were integrally related to the loan that was the subject of reorganization. Far from adopting too expansive a definition of the plenary scope of bankruptcy hearings, we hold that claims against creditors which could have been brought in that full and fair proceeding, and whose timely bringing may have affected the parameters of a bankruptcy repayment schedule, cannot be re-litigated another day in another court.
When Sure-Snap Corporation, through its then-President Alfred Shure and its current President Elaine Shure (collectively denominated as “Sure-Snap”) first entered into a loan agreement with Bradford National Bank (“Bradford”) and State Street Bank and Trust Company (“State Street”), they imagined a long and fruitful relationship would evolve. When relations eventually soured, and the loan was called early, the law provided Sure-Snap with the opportunity to file for bankruptcy, and dispose of its debts through a carefully-conceived repayment schedule. The corporation availed itself of its right, and a formal hearing confirming a reorganization plan was held. Despite the finality of the bankruptcy court’s order, Sure-Snap brought tortious conduct claims against the banks before the district court for the Southern District of Florida. The case was transferred to the District of Vermont, where Judge Parker determined that appellants’ failure to raise the lender liability claims during the bankruptcy hearing barred them from litigating them in a separate proceeding. 128 B.R. 885. For the reasons stated below, we affirm.
BACKGROUND
Although appellants attempt to distinguish the lender liability claims from the financial claims asserted in the bankruptcy proceeding, it is clear that both are based on and arise out of the same cause of action. A brief review of the factual context in which the original loans were made reveals the consequent need for preclusion. As mandated by the lower court's grant of summary judgment, all reasonable inferences are drawn in favor of appellants.
Loan arrangements for financing the Sure-Snap business began when the Bradford Bank president persuaded Alfred Shure, founder and former president of the company, and his wife Elaine, to move their metal-fixtures plant to Vermont. Bradford Bank arranged the financing for the relocation and construction of the facility, by overseeing the issuance of two Industrial Development Revenue Bonds (“IDRBs”) *871 through the Vermont Industrial Development Authority (“VIDA”).
State Street Bank agreed to collaborate with Bradford in financing the business. It purchased one IDRB for the sum of $600,000.00, while Bradford purchased the other valued at $150,000.00. To secure repayment on the two loans, the Shures granted VIDA a mortgage on their real estate and a security interest in their property and equipment. These were assigned by VIDA to Bradford, as trustee of the bonds.
As added security, State Street conditioned its financing of the facility by obtaining supervisory control over Sure-Snap’s working capital. It became the exclusive lender for the million-dollar revolving line of credit, regularly auditing Sure-Snap’s books, overseeing monthly financial reports, approving managerial decisions, and requiring that all of the business’s incoming checks be deposited into a trust account. In return, the bank was obliged to use its “best efforts” to supply a revolving line of credit for all of Sure Snap’s reasonable needs.
Despite these precautions, and although Sure-Snap was not in default of its payments, State Street decided to terminate the loan. It requested full and immediate payment, (without cause or notice, according to appellants), and cancelled the line of credit. It was this “lender conduct,” in part, that became the basis of Sure-Snap’s tort liability claims. The Chapter 11 petition for reorganization was voluntarily filed by Sure-Snap in March of 1987 in the Southern District of Florida Bankruptcy Court. Some months later, Sure-Snap submitted its plan of reorganization, together with mandatory disclosure sheets listing all of its assets and liabilities. One of these disclosure statements originally contained a statement faulting State Street for “forcing” Sure-Snap into bankruptcy. It was later deleted at the bank’s request, and an amended disclosure statement, containing no reference to any prospective counterclaims or defenses against the banks, was filed with the court.
Prior to the formal bankruptcy hearing, in April of 1988, Sure-Snap and Elaine Shure initiated an adversary proceeding against the banks, challenging the validity of the banks’ liens. They argued that the State of Vermont, which had authorized the VIDA loans, was not licensed to lend money under the state “Licensed Lender’s Act,” 8 Vt.Stat.Ann. §§ 2201-2235. Based on this complaint, the appellants filed objections to the banks’ proofs of claim regarding the two IDRB bonds. The validity of the liens were upheld by both the bankruptcy court and, on appeal, by the Southern District of Florida.
The bankruptcy hearing was held on June 16th. At this time, no pending claims was alleged against the banks, even though dated records show that an amended schedule, alleging contingent and unliquidated claims against the banks “for breach of contract, tortious interference, and fraud ...” had already been drafted and signed by Elaine Shure on June 15, 1988 — one day before the formal bankruptcy hearing commenced.
On June 28, 1988, the bankruptcy court docketed its order confirming, over both banks’ objections, Sure-Snap’s plan for reorganization. In re Sure-Snap Corporation, 94 B.R. 204 (S.D.Fla.1988). The plan provided for Sure-Snap to satisfy its outstanding debts by, inter alia, transferring to Bradford its Vermont plant in satisfaction of both banks’ claims. It was only after the court entered its order,[1] that Sure-Snap filed the previously-drafted amendment to its repayment schedule, which listed as an asset a claim of unknown value against both banks.
Subsequently, appellants moved to modify the court’s order, so as to preserve Sure-Snap’s right to bring outstanding causes of action that had not been raised in the bankruptcy case. At a hearing held October 6th, 1988, the court denied Sure-Snap’s motion to modify the confirmed plan. Two successive Motions to Reconsider the order were also denied. At the last hearing, held November 4th, counsel for *872 Sure-Snap questioned whether the decision not to modify the plan would preclude the bringing of the claims in another forum:
“[T]hat right is not curtailed by any action of this Court, is it?” the bankruptcy court judge inquired.
Counsel responded:
“If the Court were to conclude today that it’s not going to permit the modification of the plan ... and the Court then said but that is not, however, a bar to bringing of any actions by the debtor which it may otherwise appropriately bring, I have no problem with that.”
The court responded:
“I think it’s a matter of law, is it not, that any claims, I mean any actions, are reserved to the debtor?”
He then inquired of opposing counsel whether it was true that he had admitted Sure-Snap was entitled to proceed in another forum. The counsel clarified his position, and what his understanding of the “vested” right entailed:
“That’s correct, and we have the right to move to dismiss it on the same basis that the Third Circuit found determinative in Oneida and will so do it.”
At that point the judge denied the motion.
Undaunted, Sure-Snap brought the lender liability claims in the Southern District of Florida court in May of 1989 — almost one year after the bankruptcy court had confirmed the plan for reorganization. Specific allegations of predatory banking practices included claims against both banks for breach of duty to deal in good faith, breach of fiduciary duty, and, through Elaine Shure, claims alleging intentional infliction of emotional distress. Against State Street, appellants alleged the additional claims of breach of contract, interference with corporate governance, and tortious interference with business relationship. The suit asserted damages in the combined amount of $15,000,000.00
Both banks moved to dismiss, on combined estoppel and res judicata grounds. In addition, Bradford moved the court to dismiss for want of personal jurisdiction, and State Street requested transfer of venue. The case was transferred to a more convenient forum in the District of Vermont, where the action against Bradford was reinstated and State Street’s motion to dismiss was left pending.
In March of 1991, Judge Parker converted both motions to dismiss into motions for summary judgment, and on April 1, 1991, held a consolidated hearing. Finding the lender liability claims constituted the same cause of action which had been litigated in the bankruptcy proceeding, he deemed them barred by res judicata, and granted defendants’ motions for summary judgment.
DISCUSSION

I. Standard of Review

The well-established standard of review for judging a grant of summary judgment requires us to draw all inferences in favor of the non-moving party. See Burtnieks v. City of New York, 716 F.2d 982, 985-86 (2d Cir.1983). Deciding de novo whether any genuine issues of material fact exist, we affirm only when it is clear no reasonable trier of fact could find in favor of appellants. See H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1011 (2d Cir.1989).

II. Scope of Bankruptcy Hearing: Pre-clusive Effect

In judging the preclusive effect of a prior judgment for res judicata purposes, we decide first, whether the holding constituted a final judgment on the merits, and then, whether the action was brought before a court of competent jurisdiction. In re Teltronics Services, Inc., 762 F.2d 185, 190 (2d Cir.1985). Although appellants do not contest that the findings of the bankruptcy court for the Southern District of Florida constituted a final judgment, Stoll v. Gottlieb, 305 U.S. 165, 170-71, 59 S.Ct. 134, 136-37, 83 L.Ed. 104 (1938), of which we are entitled to take judicial notice, Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416, n. 3 (3rd Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, *873 102 L.Ed.2d 532 (1988), they nonetheless deny the proceeding’s preclusive effect.
Although Sure-Snap takes the standard set forth in Restatement (Second) of Judgments, § 30, as proof that a reorganization hearing is conclusive only with regard to non-property related issues which were actually litigated, the well-established rule in Miller v. Meinhard-Commercial Corp., 462 F.2d 358, 360 (5th Cir.1972), asserts that “any attempt by the parties or those in privity with them to relitigate any of the matters that were raised or could have been raised therein is barred under the doctrine res judicata.” (Emphasis supplied). See also In re Webb, 932 F.2d 155, 158 (2d Cir.1991). In response to appellants' characterization of a bankruptcy reorganization hearing as a limited, in rem proceeding, we note that these same case authorities, and the statute regulating Chapter 11 proceedings, 11 U.S.C. § 1141(a), provide for a confirmation plan to bind its debtors and creditors as to all the plan’s provisions, and all related, property or non-property based claims which could have been litigated in the same cause of action.
Appellants’ further claim that their unliq-uidated tort claims did not constitute “core proceedings,” has no bearing on their preclusion. The provisions cited, 28 U.S.C. § 157(b) and § 1334(b), set out the general jurisdictional parameters conferred on bankruptcy courts; they do not delimit where the actions should be brought in circumstances such as these. Deciding whether the lender liability claims were “core,” would in any case have been a question reserved for the bankruptcy judge to determine. § 157(b)(3).
Lastly, the judgment in Matter of Howe, 913 F.2d 1138 (5th Cir.1990), is instructive in disposing of appellants’ assertion that their right to bring the lender liability claims vested in them following confirmation, by virtue of the controlling bankruptcy statute and the judge’s comment at the modification hearing. Subsection (b) of 11 U.S.C. § 1141 provides only that “[ejxcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.” As the appellees point out, no presumption of right can be inferred from this limited directive, since, even assuming the unliquidated claims technically vested in Sure-Snap, they did so only subject to the res judicata bar. As in Howe, where the reorganization plan explicitly “reserved [to the debtors] the right to prosecute ‘any claims of action’ which ... were not previously litigated to a final judgment,” id. at 1141, and yet the subsequent bringing of the action was still barred, we hold here that the judge’s colloquy was not dispositive of appellants’ allegedly reserved right.

III. Res Judicata

Generally, in appealing to the protective nature of the bankruptcy court, a debtor is required to list a schedule of all its liquid assets and liabilities. 11 U.S.C. § 521(1). It also is required, under the dictates of Bankruptcy Rule 1007(b)(1), Form No. 6, Schedule B-2, to disclose contingent and unliquidated claims “of every nature, including counterclaims of the debtor.” Finally, 11 U.S.C. § 1125(b) requires Chapter 11 petitioners to file a mandatory disclosure statement listing all “adequate information” which would enable holders of claims to take an informed position on a proposed reorganization plan.
The June 15th date appearing on the draft of the amended schedule, indicates Sure-Snap had adequate information about the prospective lender liability claims, prior to commencement of the June 16th bankruptcy proceedings. It is thus clear that they could have brought these actions in the first instance. This determination is germane to a finding of res judicata, since that doctrine bars re-litigation not just of those claims which were brought in a prior proceeding, but of “any other admissible matter” which could have been brought, but wasn’t. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948) *874 (quoting Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1876).[2]
The test for res judicata used in this Circuit also requires that the same parties (or their privies), be litigating the same cause of action. Teltronics Services, 762 F.2d at 190. Setting aside for now the question of privity, we note that the test for deciding sameness of claims requires that the same transaction, evidence, and factual issues be involved. N.L.R.B. v. United Technologies Corp., 706 F.2d 1254, 1259 (2d Cir.1983). Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would “impair or destroy rights or interests established by the judgment entered in the first action.” Herendeen v. Champion International Corp., 525 F.2d 130, 133 (2d Cir.1975).
A. Sameness of Claims
We note from the outset, that in and of itself, the adversarial proceeding that accompanied the formal hearing was not of the scope that would have precluded the bringing of the lender liability action. In that proceeding, appellants alleged a very narrowly tailored claim which attacked the validity of the liens themselves, but not the amount of repayment the banks were entitled to. Because the question of whether VIDA was a licensed lender was a factually contained question, sharing no similarity and bearing no relevance to the debtor-creditor relationship as it was subsequently developed, we find no basis for deciding that the two claims involved the same cause of action. We take note, however, of appellees’ position that, had the scope of the former complaint been more similar to that of the second, the adversary proceeding would have been the preferred forum for Sure-Snap to have brought its claims of wrongdoing.
The formal bankruptcy hearing, confirming as it did Sure-Snap’s plan for reorganization and schedule of repayment, did necessitate preclusion of the lender liability action, as the claims premising Sure-Snap’s petition for reorganization, and those alleging predatory banking practices, were integrally related. See, e.g., Southmark Properties v. Charles House Corp., 742 F.2d 862, 871 (5th Cir.1984) (“If appellants’ challenge to Southmark’s right to thus take ownership of the property was extinguished by the prior reorganization action ... then appellants’ remedies against Southmark ‘with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose,’ also were extinguished.”) (quoting Restatement (Second) of Judgments § 24(1)).
Despite appellants’ excessively narrow characterization of the bankruptcy hearing as a proceeding of limited effect determining only the banks’ right to be paid, it is evident that the focus of contention and the basis for scheduling in that hearing encompassed the entire lender-debtor relationship, not just as initiated by assumption of the loans themselves, but as developed by State Street Bank through the working-capital funding and the early calling of the loan. See Matter of Howe, 913 F.2d at 1144 (where appellants bringing lender liability claims five years after a bankruptcy proceeding alleged that “the only right and duty resolved in the bankruptcy proceedings was the[ir] obligation ... to make payments to the Bank,” the court disagreed with the narrow characterization of the hearing’s scope, and affirmed a holding of res judicata).
In its order the lower court properly pointed out that the bankruptcy cause of action “comprised all matters ... that Sure-Snap or any creditors might have raised to advance their interest,” including not just the creditors’ proofs of claim, but *875 Sure-Snap’s petition for protection from its creditors. Fundamental to the bankruptcy court’s finding of how much Sure-Snap owed, was a finding of how much Sure-Snap had — what vestigial worth its business had retained. The sudden termination of Sure-Snap’s working line of credit by State Street was certain to have affected this factor. Therefore the post-lending conduct must have substantially influenced Sure-Snap’s efforts “to restructure its relationships with its creditors” in the bankruptcy proceeding.
In their brief, appellants all but admit the inter-related nature of the two claims, by alleging that State Street’s post-loan conduct “forced Sure-Snap into bankruptcy.” “Sure-Snap negotiated a transaction to sell itself to a group of outside investors and to repay State Street in full,” but was not afforded the time, Sure-Snap alleges. This same post-lending conduct, which Sure-Snap says tacitly influenced the disposition of the creditors’ claims during the bankruptcy proceeding, makes up the subject of appellants’ claims for intentional infliction of emotional distress, tortious interference with business relationship, etc. As the same cause of action includes, for res judicata purposes, “ ‘all the remedial rights of the plaintiff against the defendant growing out of the relevant transaction,”’ Nilsen v. City of Moss Point, 701 F.2d 556, 560, n. 4 (5th Cir.1983) (en banc) (quoting Restatement (Second) of Judgments § 24 Comment a (1982)), we hold the latter claims barred by the first of this Circuit’s four-pronged test for sameness.[3]
Appellants make a more convincing argument in trying to persuade us that the evidentiary foundation of their claims is distinct. It is technically true that in formulating a claim of tortious conduct, appellants could have supported their claim for relief by alleging only specific instances of injurious conduct (such as wrongfully dishonoring checks) — without relating the conduct back to the financial context in which it was performed. But, because the lender liability claims would be misleading if alleged in a vacuum — devoid of the financial atmosphere which prompted Sure-Snap to file for bankruptcy — the tortious conduct action should not be heard separate and apart from the original bankruptcy proceeding. See Hendrick v. Avent, 891 F.2d 583 (5th Cir.), cert. denied, — U.S. -, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990) (following bankruptcy court’s order confirming sale of an asset, trustee’s suit against purchaser alleging fraud held barred).
On the final issue of factual similarity, appellants also are not persuasive. Sure-Snap’s very allegation that the banks’ tor-tious conduct negatively influenced their business’s health, makes it hard-pressed to explain how the two causes of action — the plan of reorganization and the lender liability claims — did not comprise the same essential matter. As was stated by the court in Matter of Howe, 913 F.2d at 1144, n. 10, “[a] party may not avoid the preclusive affect of res judicata by asserting a new theory or a different remedy.” Far from there being only a few “operative facts” which were common to these successive actions, United Technologies, 706 F.2d at 1259, it appears the entire basis of contention was the same.
B. Vitiating Effect
Having determined the two causes of action were substantially the same, we are left to inquire whether allowing Sure-Snap a separate judgment on the merits of its lender liability claims, would impair, destroy, challenge, or invalidate the enforee- *876 ability or effectiveness of the original reorganization plan.
Bankruptcy Rule 1007(b)(1), which regulates the scheduling of assets and liabilities, requires a debtor to disclose “contingent and unliquidated claims of every nature ...” for the very reason that proof of either parties’ performance under the loan agreements might affect a bankruptcy court’s finding of the “validity, enforceability, and extent” of the secured loans in question.
Sure-Snap is not technically asking the district court to disturb the bankruptcy court's finding with respect to the validity of the liens. Thus, it would not necessarily be inconsistent with the bankruptcy court’s finding that these liens were valid, for the district court now to find the banks liable in tort to Sure-Snap for their conduct in administering the loans. But appellants’ failure to raise these claims (if valid) when they should have, almost certainly affected that prior judgment. Had the bankruptcy court found merit in appellants’ lender liability claims, it probably would have structured a different disposition of Sure-Snap’s assets or schedule of payments. The court might also conceivably have used its powers under 11 U.S.C. § 510 to “subordinate for purposes of distribution all or part of [the banks’] allowed claim[s],” 11 U.S.C. § 510(c)(1), or “order that [the banks’] lien[s] securing [their] subordinated claims be transferred to the estate,” 11 U.S.C. § 510(c)(2). See, e.g., In re Universal Farming Industries, 873 F.2d 1334 (9th Cir.1989) (equitable subordination appropriate when “(1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants ... and (3) subordination is not inconsistent with bankruptcy law”).
Since the doctrine of res judicata serves important interests other than protecting parties from inconsistent judgments, including “relievpng] parties of the cost and vexation of multiple lawsuits [and] encouraging] reliance on adjudication,” Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980), we agree that allowing Sure-Snap to bring lender liability claims now would violate well-established principles.
In Matter of Howe, the court reached a similar conclusion. As in this case, there the debtors had voluntarily filed for bankruptcy, initiated an adversary proceeding, and had their plan for reorganization confirmed, before filing lender liability claims against two of their creditors. The court held that “when a confirmed plan discloses and specifically treats the creditor’s claim, and the debtor has had a full opportunity to contest the creditor’s claim in an adversary proceeding ... the debtor cannot collaterally attack the bankruptcy court’s decision ... in an action based on the same transaction.” 913 F.2d at 1147.
Likewise, in Southmark, the court determined that bringing a suit alleging fraudulent conduct ten years after the fact, constituted an impermissible attack on the first order of the bankruptcy court, which had confirmed the allegedly fraudulent sale of an asset as part of the original repayment plan. Appellants’ attempt to distinguish their case by noting that “only one facet” of their loan was litigated in the bankruptcy hearing begs the question; they ought to have litigated all related facets if they could have done so.[4]
The opportunity to litigate the lender liability claims once having been provided to these appellants, “now the only way to assert those claims is through a direct at *877 tack on the judgment.” Hendrick v. Avent, 891 F.2d at 587.
C. Privity
We dispose of appellants’ final argument with brevity. On the issue of whether Elaine Shure or the estate of her deceased husband were parties to, or in privity with, Sure-Snap, and therefore also barred from bringing their causes of actions against the banks, we note their integral association to the business, and to the Chapter 11 proceeding. See, e.g., Teltronics Services, 762 F.2d at 190 (founder, president, chairman and shareholder of Chapter 11 company found to be in privity, and therefore barred from litigating previously litigated claims). Mrs. Shure, as president and CEO of the company, was its sole stockholder. She actually signed the voluntary petition for bankruptcy, the reorganization plan and disclosure statement. She later appeared as a co-plaintiff in the adversary proceeding. By the dictates of In re Justice Oakes II, Ltd., 898 F.2d 1544, 1551 (11th Cir.1990), she thus “bec[ame] a party to that proceeding even if never formally named as such.” As for Alfred Shure, because his wife is designated as the legal representative of his estate, and the law is well-settled on applying res judicata to third parties whose interests were represented by those closely aligned to them, we deem his estate bound by the preclusive effect of the first judgment as well.
CONCLUSION
The Fifth Circuit has repeatedly recognized “the important interests in the finality of judgments in a bankruptcy case.” Hendrick, 891 F.2d at 587, n. 9. See also Matter of Howe, supra, 913 F.2d at 1147. The First and Eleventh circuits, as well as a host of district courts, have also recognized the applicability of the time-honored principle of res judicata to confirmed, final bankruptcy hearings. We rule today, that in the context of lender liability claims that could have been brought before a final plan for reorganization was confirmed, but weren’t, the prior bankruptcy order was res judicata to the later action.
For these reasons, we affirm.

. The exact date of filing cannot be gleaned from the record.

. The undisputed finding that the bankruptcy court was competent to hear the lender liability claims, combined with the statutory duty of appellants’ to have claims relevant to its ability to repay heard there, argues for equitably estop-ping the subsequent attack on the plan approved by that court. Since a theory of preclusion premised on a theory of equitable estoppel would require proof of the banks’ justifiable reliance on the original repayment schedule, which proof is not yet ripe for adjudication, we restrict our inquiry to determining whether the attack on the bankruptcy court judgment was barred on res judicata grounds.

. The cases cited by appellants in defense of their position, are wholly inapposite. In In re Auto West, 43 B.R. 761 (D.Utah 1984), the court expressly limited the right to bring additional claims to those narrow instances where a creditor named in the second action, was not treated or mentioned in the original reorganization plan. 43 B.R. at 763. The court in Goodman v. Phillip R. Curtis Enterprises, Inc., 809 F.2d 228 (4th Cir.1987), allowed a post-confirmation suit for personal injury to proceed against the creditors only because it constituted an "attempted modification! 1 of the confirmed plan.” Id. at 233. Because modifications of a plan have the effect of extending, or retaining, a bankruptcy court’s further jurisdiction of claims, 11 U.S.C. § 1127, the court in Goodman was authorized to do what we cannot, by the clear dictates of res judicata, do here.

. Sure-Snap’s misplaced reliance on the McDonald v. Johnson & Johnson case, 776 F.2d 767 (8th Cir.1985), as proof to the contrary, points out the strain in their argument. In that case, the court expressly stated that no "res judicata principles [were] at stake.” Id. at 769. Moreover, the two causes of action at issue were originally named in the same complaint: it was only procedural technicalities that necessitated that one of the actions be retried at a later time. In Sure-Snap’s case, however, the fact that the banks’ creditors claims, and the tort claims, arose at different times, was due purely to the self-serving effort by Sure-Snap to bring the latter claims in a vacuum, separate and apart from the financial context that may have necessitated such actions. Accordingly, the separateness is not proof that the claims constitute distinct causes of action.