**In re Gary P. GRIMM & Ann E. Grimm, Debtors-in-possession.**

**Bankruptcy No. 91–12262–AB.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

June 7, 1994.

David R. Kuney, Michael L. Shor, David & Hagner, P.C., Washington, DC, for Grimms.

David B. Tatge, Ginsburg, Feldman & Bress, Chartered, Washington, DC, for FDIC.

Frank Bove, Office of U.S. Trustee, Alexandria, VA, for U.S. Trustee.

### MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

At issue in this matter is whether the record should be reopened on remand. In

March 1993, the Court approved the fourth and final fee application of the law firm of David & Hagner, P.C. over the objections of the Federal Deposit Insurance Corporation ("FDIC"). The fees were for services rendered by David & Hagner in defending Gary and Ann Grimm (the "Grimms") against a dischargeability suit brought by the FDIC. The FDIC appealed from the order awarding fees. The District Court then remanded the matter with instructions to make a factual finding as to whether the services rendered by David & Hagner benefitted the bankruptcy estate. *See In re Grimm,* 156 B.R. 958 (E.D.Va.1993).

Thereafter, David & Hagner moved this Court to reopen the record so it could present evidence on the issue of benefit to the estate. The FDIC objected to such reopening. After oral argument, we took the matter under advisement. For the reasons that follow, we grant David & Hagner's request to reopen the record.

### I.

A more detailed review of the facts is warranted at this point. In June 1991, the Grimms filed their petition for relief under Chapter 11 of the Bankruptcy Code. The Grimms also submitted an application to employ David & Hagner as counsel, which was subsequently approved by this Court.

Three months after the filing of the petition, the FDIC, as receiver of a creditor-bank, initiated an adversary proceeding against the Grimms under 11 U.S.C. § 523(a)(2) and (a)(6). The FDIC's complaint alleged wrongdoing by the Grimms in obtaining two loans for the purpose of buying and expanding a chemical plant located in Demopolis, Alabama. The complaint sought a nondischargeable judgment of $8 million. The litigation commenced by the FDIC never reached trial, although it lasted a year and eight months.

David & Hagner asserts that, in January 1992, the Grimms and the unsecured creditors' committee entered into an agreement concerning the fees charged for defending the Grimms in the FDIC suit. The agreement permitted David & Hagner to collect from the estate a maximum of $100,000 as compensation for defending the Grimms in the FDIC litigation. The $100,000 cap was subsequently incorporated into the second amended plan of reorganization, which stated that the $100,000 award was still "[s]ubject to court approval." Second Amended Plan of Reorganization ¶ 3.1.

The second amended plan then proceeded to confirmation, notwithstanding the FDIC suit that was still pending before this Court. The plan bifurcated the FDIC's claim into secured and unsecured portions. The FDIC raised several objections to the plan, which the Court overruled when it confirmed the plan on December 15, 1992. A careful review of the record fails to reveal any indication that the FDIC objected to the plan on grounds that its dischargeability suit impeded the prospect of a successful reorganization.

During the course of the Chapter 11 case, David & Hagner filed three interim requests and a final request to collect fees and expenses from the estate. The FDIC objected to each of these requests, arguing *inter alia* that the fees and expenses incurred in connection with the FDIC suit benefitted only the Grimms, not the estate. At a hearing on March 16, 1993, this Court rejected the "benefit to the estate" argument advanced by the FDIC. The Court reasoned that denying compensation in dischargeability proceedings would, in effect, deny debtors legal representation in those instances. *See Grimm,* 156 B.R. at 960 n. 2 (quoting the decision of this Court). The ruling of this Court implicitly rejected the notion that "benefit to the estate" is a necessary element for an award of compensation under 11 U.S.C. § 330(a).[1] The Court thus overruled the FDIC's objec-

---

1. 11 U.S.C. § 330(a) provides in pertinent part:
 (a) After notice ... and a hearing ... the court may award to ... the debtor's attorney—
 (1) reasonable compensation for actual, necessary services rendered by such ... attorney, as the case may be ... based on the nature, the

extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
(2) reimbursement for actual, necessary expenses.

tions, and granted David & Hagner's fourth and final request. The FDIC appealed.

In April 1993, the Grimms and the FDIC entered into a settlement agreement with respect to the FDIC litigation. As a result of that settlement, this Court signed a consent order dismissing the FDIC suit. The settlement, however, did not resolve the controversy concerning fees.

In August 1993, the District Court rendered its decision concerning the FDIC appeal. Observing that the issue of "benefit to the estate" was "not yet settled in this circuit," the District Court held that an award of compensation under § 330(a) required a "predicate judicial finding" that the fees and expenses were incurred for services that benefitted the estate. *Grimm,* 156 B.R. at 959, 961–62. In reaching its decision, the District Court rejected the view that services rendered in defending a dischargeability suit would *never* benefit the estate. It concluded, instead, that the facts of each case determined whether there was a benefit. *See id.* at 962 (citing *In re Murray,* 132 B.R. 808, 809–10 (Bankr.D.Mass.1991)). Because it concluded that no findings of fact had been made by this Court, the District Court remanded the matter, and instructed this Court to "examine all the fee requests for services and expenses incurred in connection with the discharge proceeding to ascertain whether any of these services or expenses benefitted the bankruptcy estate." *Id.* at 962 n. 8, 963.

As to reopening the record, the District Court said the decision to reopen was within this Court's discretion. *Id.* at 962 n. 8. It noted, however, that "the already voluminous record and the attention already devoted to the absence or presence of any benefit to the estate may militate against any extensive additional effort [to make a factual finding]." *Id.* It is clear, however, that the decision to reopen is within our discretion. *Id.* After the District Court rendered its decision, David & Hagner moved to reopen the record.

**2.** Part II of this opinion addresses the first ground asserted by David & Hagner. Because we find the first ground sufficient to reopen the record, we need not reach the second ground advanced by David & Hagner, which is discussed briefly in part III *infra.*

## II.

■ A decision to reopen the record is within the sound discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971). David & Hagner asserts two grounds to persuade the Court to reopen the record.[2] First, David & Hagner asks that the record be reopened so it may "address the background, interpretation, and significance" of the January 1992 agreement between the Grimms and creditors' committee. As noted above, the January 1992 agreement provided, among other things, that David & Hagner could collect up to $100,000 from the estate for defending the Grimms in the FDIC suit. Specifically, David & Hagner suggests that it "could" introduce evidence showing that the Grimms and the creditors' committee viewed the FDIC suit as "entirely meritless" and as an "impediment" to the Grimms' plan of reorganization.[3] Furthermore, David & Hagner suggests that the January 1992 agreement was "an essential part of the reciprocal promises and agreements which formed the basis for the entire Amended Plan of Reorganization."[4] In response, the FDIC raises several objections that we will address *seriatim.*

### A.

■ The FDIC contends first that the record should not be reopened because the parties have "fully litigated" the issue of benefit to the estate. In its memorandum, the FDIC cites ten instances in the record that purportedly show that the issue of benefit to the estate has been "fully briefed" and "argued." For the reasons that follow, we conclude that the portions of the record cited by the FDIC fail to provide sufficient ground from which we can make a decisive finding of fact. *See Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 464–65 (6th Cir.1991) (concluding that

**3.** Debtors' Supplemental Memorandum in Support of Request to Re–Open Record at 5.

**4.** *Id.*

"reopening for the purpose of making a more complete record was not an abuse of discretion" by the trial court).

In support of its position that "benefit to the estate" was fully litigated, the FDIC cites the second, third and fourth fee applications of David & Hagner. Yet, the cited portions of the fee applications only address the twelve factors set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir.), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), for determining whether the amount requested is "reasonable" under 11 U.S.C. § 330.[5] They do not address whether the January 1992 agreement between the Grimms and the creditors' committee led to a workable and feasible plan.

The FDIC also makes reference to the transcripts of two hearings that dealt with David & Hagner's second and fourth fee applications, respectively. At those hearings, David & Hagner did assert that its defense benefitted the estate because the FDIC litigation threatened the formulation of a plan.[6] These assertions lack the foundation of testimony or documentary evidence from which the Court can make an adequate finding.

Additionally, reference is made to four FDIC memoranda objecting to each of the four fee requests. All four memoranda urged this Court to rule, *as a matter of law*, that services rendered to defend debtors never benefit the estate.[7] Hence, the legal arguments advanced in each memorandum fail to supply any factual ground that would support a finding.

Two of the four memoranda, however, attempt to advance a fact-based argument. Both memoranda complained of the "highly costly," "vexatious," "risky," and "unusually aggressive" motions practice conducted by David & Hagner in defense of the Grimms.[8] This Court does not condone any practice designed to delay litigation or enhance legal fees. Nevertheless, it stands to reason that David & Hagner's "aggressive" defense in the dischargeability suit may very well have been one of the factors leading the FDIC to the settlement table. This would be relevant if the FDIC suit initially impeded the formulation of the reorganization plan. In this regard, David & Hagner should have the opportunity to introduce any relevant proof.[9]

### B.

█ The FDIC asserts that any deficiency in the record is a loss that should be borne by David & Hagner because David & Hagner had a duty to make the original record complete. In other words, David & Hagner should not be permitted to introduce evidence that it could have presented earlier.

The FDIC's position, however, is unpersuasive because the legal standard governing this case changed on appeal. *See Skehan v. Board of Trustees*, 590 F.2d 470, 479 (3d Cir.1978) ("[A] change in legal standards may warrant the reopening of a case where addi-

---

5. *See Harman v. Levin*, 772 F.2d 1150, 1151 (4th Cir.1985) (stating that the *Barber* factors are "appropriate to determine attorney's fee awards in bankruptcy"). *But see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986) (observing that these 12 factors are "sometimes subjective," and "place[] unlimited discretion in trial judges and produce[] disparate results").

6. *See* Transcript of April 21, 1992, at 8–9, 11; Transcript of March 16, 1993, at 6.

7. *See, e.g.*, Objection of Federal Deposit Insurance Corporation, as Receiver for the National Bank of Washington[,] to David & Hagner P.C.'s Fourth Interim Application for Compensation at 5 ("The near unanimous view that, *as a matter of law*, attorneys' fees incurred in the defense of dischargeability litigation may not be recovered from the estate because such labors do not actu-

ally benefit the estate should be applied in this case." (emphasis added and citation omitted)).

8. *See* Objection of Federal Deposit Insurance Corporation, as Receiver for the National Bank of Washington, to Debtors' Second Interim Application for Allowance of Compensation at 7–12; Objection of Federal Deposit Insurance Corporation, as Receiver for the National Bank of Washington[,] to David & Hagner, P.C.'s Third Interim Application for Compensation at 7–14.

9. The FDIC also cites a reply memorandum in which David & Hagner argued that res judicata barred the FDIC from objecting to the fee applications. *See* Reply to Objection of Federal Deposit Insurance Corporation as Receiver for the National Bank of Washington to David & Hagner, P.C.'s Fourth Interim Application for Compensation at 5–6. Again, the memorandum makes a *legal* argument, and hardly supplies any facts upon which adequate findings can be made.

tional testimony would be pertinent to the change of law.") (concluding, however, that the asserted change did not warrant a re-opening of the record), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979); *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 78 B.R. 162, 165 (Bankr. E.D.Tenn.1987) ("A change in or clarification of the law has been recognized as a ground for re-opening the proof."), *aff'd*, 930 F.2d 458, 464–65 (6th Cir.1991); 6A James W. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 59.04[13], at 59–36 (2d ed. 1994).

*Chattanooga Wholesale, supra*, is one bankruptcy case addressing the issue of whether to reopen the record after such a change occurs. In that case, the Chapter 7 trustee initiated a preference action under 11 U.S.C. § 547 following conversion of the bankruptcy case from Chapter 11 to Chapter 7. As part of their prima facie showing, trustees must prove that the alleged prefer-ential transfers gave the transferees more than they would receive in a Chapter 7 case. *See* 11 U.S.C. § 547(b)(5). Accordingly, at trial, the trustee presented testimony of what unsecured creditors received in the Chapter 11 phase, and what those creditors would receive in the Chapter 7 liquidation. *Chattanooga Wholesale*, 78 B.R. at 164. After the evidence had been presented, but before the bankruptcy court made its ruling, the Court of Appeals for the Sixth Circuit decided that, in order to make a showing under § 547(b)(5), trustees must introduce evidence of what the transferee would have received in a hypothetical Chapter 7 case that com-menced on the same date the actual Chapter 11 petition was filed. *See Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir.1986). In light of the *Tenna* decision, the bankruptcy court concluded that "the trustee had failed to prove his case under § 547(b)(5)." *Chattanooga Wholesale*, 78 B.R. at 164.

The trustee then asked the bankruptcy court to reconsider its ruling and to reopen the record so he could introduce additional evidence. The bankruptcy court observed that, at the time of trial, the trustee "*should have known* that in a case which began under chapter 11 and converted to chapter 7, § 547(b)(5) could be interpreted to require proof of the actual effect of a bankruptcy case or proof of a hypothetical liquidation at the beginning of the case." *Id.* at 165 (em-phasis added). The court said, however, that it would not penalize the trustee for failing to present the evidence "when the law became settled after trial but before the court en-tered judgment." *Id.* Particularly impor-tant to the bankruptcy court was the fact that reopening would not "require the [defen-dant] to submit its evidence again." *Id.*[10]

In the case at bar, the District Court al-tered the situation when it required fee appli-cants to prove that the services they ren-dered in defending dischargeability actions benefitted the estate. Before the appeal, there was no controlling authority that re-quired a finding of benefit to the estate in order to recover fees and expenses for ser-vices rendered in dischargeability proceed-ings. Even the District Court acknowledged that the "benefit to the estate" issue was "not yet settled in this circuit," and it suggested, moreover, that the statute governing com-pensation, 11 U.S.C. § 330(a), was ambiguous as to whether a predicate finding of "benefit to the estate" was necessary. *Grimm*, 156 B.R. at 959, 961.

Although the FDIC asserted that a "ma-jority" of courts had found that the defense of dischargeability suits never benefitted the estate, it conceded that there was at least a "splinter of authority" that adopted an oppos-ing view. At the final hearing on fees, this Court rejected the "benefit to the estate" argument advanced by the FDIC. It was

---

**10.** In affirming the decision to reopen the rec-ord, the Court of Appeals for the Sixth Circuit ruled that it was not necessary for the bankrupt-cy court to rely on *Tenna* in order to reopen. *Chattanooga Wholesale*, 930 F.2d at 464. The court of appeals concluded that it was not an abuse of discretion to reopen the record in order to make it more complete. *Id.* at 464–65. Like-wise, we have concluded that reopening is neces-

sary here in order to make the record more complete. *See supra* part II.A. Although it ex-pressed that the bankruptcy court's reliance on *Tenna* was unnecessary, the court of appeals nevertheless affirmed the principle that "[a] change in legal standards is a proper ground for reopening proof." *Chattanooga Wholesale*, 930 F.2d at 464.

not until this dispute reached the District Court that David & Hagner had to prove that their defense conferred a benefit. Consequently, David & Hagner should not be penalized for failing to present its evidence earlier.

■ Finally, as in *Chattanooga Wholesale,* this is "not the kind of case in which reopening will require the [FDIC] to submit its evidence again." *Chattanooga Wholesale,* 78 B.R. at 165 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Because the FDIC does not have the burden of proof, it may choose to rest on the facts already presented, and attack the evidence introduced by David & Hagner. Accordingly, the FDIC will not suffer prejudice if the record is reopened.

■ In response to the foregoing, the FDIC relies on *Patterson v. American Tobacco Company,* 586 F.2d 300 (4th Cir.1978). There, the Court of Appeals for the Fourth Circuit remanded a case to the district court so the latter could make further findings of fact in light of *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a decision of the United States Supreme Court that modified the law of employment discrimination. The court of appeals observed that *Teamsters* had been rendered after the district court had made its original decision. The court of appeals thus remanded the case because the issue presented in *Teamsters* "emerged after the original record was made." *Patterson,* 586 F.2d at 304.

Relying on *Patterson,* the FDIC contends that the record should not be reopened because the issue of "benefit to the estate" emerged before the original record was closed. We do not read *Patterson* so narrowly. Although the court of appeals believed that a newly-formed issue was sufficient to reopen the record *in that instance,* it did not expressly exclude other grounds that would justify reopening.

■ The FDIC also points to a district court decision to reopen the record that was reversed by the Court of Appeals for the Third Circuit in *Casey v. Planned Parenthood,* 14 F.3d 848 (3d Cir.), *stay denied,* —— U.S. ——, 114 S.Ct. 909, 127 L.Ed.2d 352 (Souter, Circuit Justice 1994). In *Casey,* the United States Supreme Court "established the 'undue burden' test as the sole standard for assessing the constitutionality of an abortion regulation...." *Id.* at 854. Applying the test, the Supreme Court found most provisions of a state abortion statute to be constitutional. *Id.* On remand, however, the district court granted the plaintiffs' request to reopen the record so the plaintiffs could introduce evidence showing that the statute was unconstitutional under the "undue burden" test. In reversing the decision to reopen, the court of appeals reasoned that, because the Supreme Court had already applied the undue burden test in the first instance, its decision to uphold the statute was the law of the case, so reopening the record would only undermine the Supreme Court's mandate. *See id.* at 859–62.

Here, in contrast, the District Court established "benefit to the estate" as the governing standard, and remanded the matter so we could apply the standard in the first instance. Although the District Court may have been skeptical as to whether David & Hagner could prove benefit to the estate, *see Grimm,* 156 B.R. at 961, it did not apply the "benefit to the estate" standard to the facts of this case. Hence, reopening the record will not undermine the mandate of the District Court. Indeed, the District Court expressly stated that this Court had discretion to reopen the record "for good cause." *Id.* at 962 n. 8. Given the deficiencies in the record and the District Court's decision to require a showing of benefit to the estate, we conclude that good cause exists for reopening the record.[11]

11. After the Court of Appeals for the Third Circuit reversed the district court's decision in *Casey,* the plaintiffs asked Justice Souter, in his capacity as circuit justice, to stay the mandate of the court of appeals. *See Planned Parenthood v. Casey,* —— U.S. ——, 114 S.Ct. 909, 127 L.Ed.2d 352 (Souter, Circuit Justice 1994). In denying their request, Justice Souter observed, among other things, that the plaintiffs had a fair opportunity to develop the record in the district court. *Id.* at ——, 114 S.Ct. at 911–12. Again, the situation in *Casey* is different from that of the

■ Before we proceed to other issues, we direct our attention to *United States v. Virginia*, 88 F.R.D. 656 (E.D.Va.1980), a decision that was rendered within our district. There, the Court of Appeals for the Fourth Circuit remanded an employment discrimination case to the district court in light of the former's decision in *EEOC v. Radiator Specialty Co.*, 610 F.2d 178 (4th Cir.1979), and instructed the district court to reopen the record. *See Virginia*, 88 F.R.D. at 660. Notwithstanding the Fourth Circuit's mandate, the district court expressed its dissatisfaction with reopening the record because, in its view, any error of law committed at trial did not preclude the parties from developing or introducing evidence. *See id.* at 667–68.

The district court's reasoning in *Virginia* does not apply here due to the fact that, in *Virginia*, no significant change in the law occurred; the district court mentioned that *Radiator Specialty* "did not introduce any substantially new element into the law of employment discrimination," but merely shifted the burden of proving certain aspects of the case from the plaintiff to the defendant. *Virginia*, 88 F.R.D. at 667. Here, in contrast, a "substantially new element" of proving benefit to the estate has been imposed upon David & Hagner. The circumstances are therefore appropriate for the Court to exercise its discretion to reopen the record.[12]

## C.

■ As noted above, David & Hagner suggests that the FDIC suit initially operated as an "impediment" to the reorganization plan. David & Hagner has indicated that, if the record were reopened, it "could" introduce evidence showing that the January 1992 agreement with the creditors' committee, in effect, prevented the FDIC suit from impeding the plan. In response, the FDIC notes that an essential element for plan confirmation is a finding by the court that the plan is feasible. *See* 11 U.S.C. § 1129(a)(11).[13] Because this Court confirmed the plan before the FDIC suit was settled, the FDIC contends (without citing any authority) that "res judicata" bars David & Hagner from asserting that the FDIC suit initially impeded the plan.

The term "res judicata" is sometimes used sweepingly to refer to two doctrines that address the preclusive effect of a prior judgment. *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 535 (5th Cir.1978). Under the first doctrine known as claim preclusion or true res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). To invoke claim preclusion, a party must establish the following three elements: "(1) a final judgment on the merits in an earlier suit, (2) an identity of cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Nash City Board of Educ. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir.), *cert. denied*, 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981).

■ Applying these elements, we note that an order confirming a plan of reorganization is a "final judgment on the merits" for purposes of res judicata. *See Eubanks v. FDIC*, 977 F.2d 166, 170–71 (5th Cir.1992); *see also* 11 U.S.C. § 1141(a) (stating that a confirmed plan binds the debtor and all par-

---

instant case because, as Justice Souter noted, the United States Supreme Court applied the "undue burden" test in the first instance instead of instructing the district court to do so. *See id.* at ——, 114 S.Ct. at 911. Here, in contrast, the District Court established "benefit to the estate" as a necessary element for recovering compensation, and remanded the matter so we could apply that element in the first instance.

**12.** Another important feature of *Virginia* is that the district court had *no discretion* because the court of appeals mandated the reopening of the record. *Id.* Indeed, that mandate prompted the district court, in the end, to allow the reopening.

**13.** Section 1129(a)(11) provides:
(a) The court shall confirm a plan only if all of the following requirements are met:
＊ ＊ ＊ ＊ ＊ ＊
(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

ties in interest regardless of whether a particular party accepted the plan); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Inv., Inc.)*, 162 B.R. 426, 433 (Bankr. S.D.N.Y.1993) ("[A] confirmed plan of reorganization has full preclusive effect and is binding on all parties thereto."). Furthermore, we assume without deciding that an "identity of parties" exists with respect to the reorganization plan and this fee application dispute. The sole remaining issue at this point is whether an "identity of claims" exists with respect to the reorganization plan and fee applications.

The Court of Appeals for the Fourth Circuit has adopted a transactional approach for determining whether two causes of action are the same. *See Keith v. Aldridge*, 900 F.2d 736, 740 (4th Cir.), *cert. denied*, 498 U.S. 900, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990); *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987). Hence, "the appropriate inquiry is whether the new claim arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." *Harnett*, 800 F.2d at 1313.

Some courts of appeals have used the transaction-based approach to determine whether a confirmed plan precludes a suit that is filed after confirmation. *See, e.g., Sure–Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869 (2d Cir.1991); *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138 (5th Cir.1990). In one leading decision, *Sure–Snap, supra*, the Court of Appeals for the Second Circuit held that res judicata precluded the lender liability suits that the debtor and its principals had brought against two banks after plan confirmation. The debtor in *Sure–Snap* had admitted that one of the banks had "forced" the debtor into bankruptcy when it called a loan early and terminated a line of credit to the debtor. *Sure–Snap*, 948 F.2d at 871, 875. Because this "lender conduct" formed, in part, the basis of the lender liability claims, the *Sure–Snap* court concluded that the reorganization plan and the lender liability claims were the same

cause of action. *Id.* at 871, 874–75. As the court reasoned, "[the debtor's] very allegation that the banks' tortious conduct negatively influenced their business health, makes it hard-pressed to explain how the two causes of action—the plan of reorganization and the lender liability claims—did not comprise the same essential matter." *Id.* at 875.

The case at bar is distinguishable from *Sure–Snap* because the claims presented here are drawn from different transactions. Here, the FDIC's claim derives from the loans made to the Grimms in connection with their purchase and expansion of a chemical plant in Demopolis, Alabama. The transactions causing the Grimms to seek reorganization, however, are more broadly based. The disclosure statement reveals that the Grimms sought bankruptcy relief not only because of "substantial losses" incurred in connection with the Demopolis plant, but also because of the decline of the real estate markets in Maryland and Northern Virginia.[14]

Even more distinct are the transactions underlying David & Hagner's request for an administrative claim. Neither the Demopolis plant nor the real estate market provides the transactional basis for David & Hagner's request. Instead, the legal services rendered by David & Hagner are the source of its claim.[15]

Additionally, the court in *Sure–Snap* invoked res judicata to prevent the debtor from obtaining the proverbial "second bite of the apple." 948 F.2d at 870. The lender liability actions in *Sure–Snap* essentially were post-confirmation counterclaims filed against creditors. In contrast, the fee application filed by David & Hagner does not operate as a counterclaim against the FDIC. Instead, it functions as a request to receive a distribution under the Chapter 11 plan. Accordingly, the Court concludes that no "identity of claims" exists in the case at bar.

■■■ Contrary to the FDIC's position, two claims are not the same simply because they share a common issue. A common issue does, however, present the possibility of "is-

---

**14.** Second Amended Disclosure Statement at 12–13.

**15.** *See, e.g.,* Fourth Interim Application for Compensation for Debtors' Legal Counsel at 2–6.

sue preclusion" or "collateral estoppel," which is the second doctrine falling under the rubric of res judicata. As the Supreme Court of the United States explained in *Cromwell v. County of Sac,* 94 U.S. 351, 24 L.Ed. 195 (1876), "where the second action between the same parties is upon a *different claim or demand,* the judgment in the prior action operates as an estoppel only as to those matters *in issue* or points controverted...." *Id.* at 353 (emphasis added). Consequently, we turn to the doctrine of collateral estoppel.

### D.

Collateral estoppel precludes a party "from relitigating an issue that was *actually litigated* and decided in an earlier proceeding and that was necessary to the [earlier] decision." *Combs v. Richardson,* 838 F.2d 112, 113 (4th Cir.1988) (emphasis added). Our analysis need only focus on whether the issue has been actually litigated. Under collateral estoppel, an issue may be "actually litigated" even in the absence of a full-blown evidentiary hearing. However, a question of fact is actually litigated when it is (1) put into issue by the pleadings, (2) submitted to the trier of fact, and (3) determined by the trier of fact. *Santopadre v. Pelican Homestead & Sav. Ass'n,* 937 F.2d 268, 273 (5th Cir.1991); *see also United States v. Young,* 804 F.2d 116, 118 (8th Cir.1986) (stating that a fact established by stipulation, not judicial resolution, has not been "actually litigated," and "thus is the proper subject of proof in subsequent proceedings"), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987).

Nevertheless, the party invoking collateral estoppel has the burden of establishing that the issue was actually litigated. *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166

(4th Cir.1982) ("The burden is on the party asserting collateral estoppel to establish its predicates, and this of course includes presenting an adequate record for the purpose."). In *Allen,* the Court of Appeals for the Fourth Circuit declined to invoke collateral estoppel when, among other things, it was unclear from the trial record that an important element of the plaintiff's case had been contested in the first action. *Id.*

Similarly, in the instant case, it is unclear from the record whether the issue of plan feasibility was actually litigated at the confirmation hearing. Although the FDIC raises "res judicata" as a shield against David & Hagner's fee request, it fails to point to any portion of the record where the parties contested the issue of whether the FDIC suit impeded the prospect of a successful reorganization. Consequently, the FDIC has not met its burden with respect to collateral estoppel.[16]

Furthermore, to be confirmed, a reorganization plan must satisfy the predicates of 11 U.S.C. § 1129. In its objection to plan confirmation, the FDIC listed several predicates of § 1129(a) that the Grimm plan allegedly failed to meet. In the same objection, however, the FDIC did not list § 1129(a)(11), which requires the plan to be feasible.[17] Hence, the plan's feasibility was not put into issue by the pleadings. Accordingly, we cannot conclude that the feasibility issue was "actually litigated." Collateral estoppel therefore does not attach.

It is worth noting, additionally, that the evidence proffered by David & Hagner does not necessarily implicate the issue of feasibility. As noted earlier, David & Hagner suggests that it "could" introduce proof that the January 1992 agreement between the Grimms and the creditors' committee led to "the reciprocal promises and agreements which formed the basis for the entire Amend-

---

16. The court in *Allen* did invoke another doctrine—judicial estoppel—to preclude the plaintiff from asserting a position in the subsequent trial that was inconsistent with his position in the first trial. *See id.* at 1166–68. Likewise, we conclude that judicial estoppel precludes David & Hagner from asserting that the plan was unfeasible *at the time of confirmation* because that would be a position that is contrary to the position taken at the confirmation hearing. Judicial estoppel,

however, would not prevent David & Hagner from showing that the FDIC suit *initially* impeded the plan, and that David & Hagner's efforts removed the "impediment" before confirmation.

17. *See* Objections of the Federal Deposit Insurance Corporation, as Receiver for the National Bank of Washington[,] to Confirmation of the Debtors' Second Amended Plan of Reorganization at 1–2.

ed Plan of Reorganization." [18] This evidence is relevant as to how the plan was created, not whether the plan was feasible. David & Hagner also says that it "could" introduce evidence showing that the FDIC suit was "entirely meritless." [19] Again, this evidence does not necessarily implicate the issue of feasibility. At most, it could support the position that the plan *was* feasible because a "meritless" FDIC suit would not impede the prospect of a successful reorganization.

### E.

The FDIC also argues that its dischargeability action had merit and that, even if it lacked merit, David & Hagner still could not argue that its defense benefitted the Grimms *and* the estate. Whether David & Hagner's defense against a "meritless" FDIC suit benefitted the estate is an issue that should not be decided in the abstract. It is, rather, a question that is best left for determination after all the evidence has been presented. Even if we denied David & Hagner the opportunity to show that the FDIC suit lacked merit, David & Hagner could still introduce evidence showing that the January 1992 agreement contributed to the creation and preservation of the reorganization plan. Hence, even if we excluded evidence showing that the FDIC suit lacked merit, ample ground still remains for the Court to reopen the record.

Finally, the FDIC asserts that the dischargeability litigation could not have possibly impeded the plan. First, the FDIC alleges that the litigation would not have affected any dividends paid under the plan because the Grimms were not required to contribute any post-petition salary. Second, the FDIC argues that the alleged impediment was never removed by David & Hagner because the dischargeability litigation was settled *after* confirmation of the plan.

The situation, however, is not as clear-cut as the FDIC would have us believe. Although post-petition salary may not have been subject to the reorganization, the confirmed plan still required the Grimms to contribute approximately $250,000 that was supposed to come from "sources outside of the Bankruptcy Estate...." [20] Whether David & Hagner did anything to safeguard that sum is an issue that is best left for an evidentiary hearing. Furthermore, the creditors' committee could have believed that the plan would remain viable after confirmation so long as David & Hagner continued to defend the Grimms. Again, whether the creditors' committee actually held that view is an issue that is best left for an evidentiary hearing.

While David & Hagner has the burden of proving benefit to the estate, we believe, in light of the circumstances, that David & Hagner should have the opportunity to meet that burden. Consequently, the Court will exercise its discretion to reopen the record.

### III.

As additional grounds for reopening the record, David & Hagner cites "new evidence" that was produced after this Court granted David & Hagner's final request for fees and expenses. David & Hagner contends that, during the negotiations to settle the FDIC suit, the FDIC "voluntarily produced" an internal memorandum showing that the FDIC suit lacked merit and that the Grimms were honest. In response, the FDIC argues that the memorandum was inadvertently disclosed during settlement negotiations. The FDIC contends further that the contents of the memorandum are irrelevant, and that the memorandum itself is still protected by the attorney-client privilege and by Federal Rule of Evidence 408, which provides that certain communications made during settlement discussions are inadmissible to prove liability or the invalidity of a claim.

At this point, we need not resolve the controversy regarding the FDIC memorandum for two reasons. First, the initial grounds advanced by David & Hagner, which are discussed above in part II, are sufficient for reopening the record. Second, whether the FDIC waived the attorney-client privilege depends on the facts and circumstances surrounding the memorandum's disclosure. *See FDIC v. Marine Midland Realty Credit*

---

18. Debtors' Supplemental Memorandum in Support of Request to Re–Open Record at 5.

19. *Id.*

20. Second Amended Plan of Reorganization ¶¶ 4.3, 5.7.

*Corp.,* 138 F.R.D. 479 (E.D.Va.1991). Accordingly, we will decide the issue of waiver after the parties have presented evidence as to how the memorandum was disclosed.

 Finally, while addressing the issues concerning the disclosed memorandum, the FDIC urged the Court to disregard the unsolicited, post-hearing brief that David & Hagner had filed. We decline to do so for two reasons. First, this Court has ruled that it will not resolve the issues concerning the disclosed memorandum until the evidence is presented. Second, this Court observes that, in response to the unsolicited brief filed by David & Hagner, the FDIC filed its own post-hearing brief totaling 30 pages plus four exhibits. Accordingly, the FDIC cannot be heard to argue that it was prejudiced by David & Hagner's post-hearing memorandum. *Cf. Jungkurth v. Eastern Fin. Svcs. (In re Jungkurth),* 74 B.R. 323, 325 (Bankr. E.D.Pa.1987) (allowing lender to file a reply brief in response to the unsolicited memorandum filed by the debtor).

### IV.

For the foregoing reasons, David & Hagner's request to reopen the record is granted. An appropriate order will be entered.