**APEX MANAGEMENT CORPORATION and Cedas Realty, Inc., Plaintiffs,**

v.

**WSR CORPORATION, Defendant.**

**No. 97 C 1301.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 31, 1998.

Bruce Robert Meckler, Bates, Meckler, Bulger & Tilson, Chicago, IL, for plaintiffs.

Randall Allan Hack, Michael Yetnikoff, Lord, Bissell & Brook, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs Apex Management Corporation ("AMC") and Cedas Realty, Inc. ("Cedas") filed suit in this Court alleging that defendant WSR Corporation ("WSR") made misrepresentations and committed fraud in connection with its sale of Whitlock Corporation ("Whitlock") to Apex Automotive Warehouse, L.P. ("Apex"). AMC and Cedas contend in Counts I and III that WSR made misrepresentations—upon which they detrimentally relied—regarding Whitlock's value, condition, and management. In Counts II and IV, AMC and Cedas claim that WSR committed fraud by knowingly providing them false financial information about Whitlock in order to inflate the price of the transaction. WSR has moved to dismiss plaintiffs' complaint with prejudice. For the reasons that follow, we grant WSR's motion.

### FACTUAL BACKGROUND

AMC and Cedas are Illinois corporations which, respectively, are the sole general and limited partners of Apex, an Illinois limited partnership. Complt. ¶¶ 1–2. Cedas owns 99% and AMC owns 1% of Apex. *Id.* ¶ 8. WSR is a Delaware corporation with its principal place of business in New Jersey. *Id.* ¶ 3. At all relevant times, Apex, AMC, Cedas, and WSR conducted business in Illinois. *Id.* ¶ 4.

On December 6, 1994, Apex entered into a stock purchase agreement ("SPA") with WSR to purchase all the outstanding stock of Whitlock, a corporation that sold automotive parts through a distribution warehouse and retail stores. *Id.* ¶¶ 6, 8. AMC, as the general partner of Apex and a fiduciary of Apex and Cedas, negotiated the transaction on behalf of itself, Apex, and Cedas. *Id.* ¶ 7. In exchange for Apex's acquisition of Whitlock, the SPA required Apex to pay WSR $22,410,466 at the transaction's closing. *Id.* ¶ 9. It further provided that WSR was to prepare a balance sheet ("Closing Balance Sheet") to reflect Whitlock's value as of the closing date ("Closing Book Value"). *Id.* ¶ 10.

The Closing Balance Sheet was to have been audited by Deloitte & Touche, L.L.P. *Id.* The Closing Book Value was to be calculated in accordance with Schedule 2.4(c) of the SPA. *Id.* ¶ 11. If the Closing Book Value was less than $20,810,466, the SPA obligated WSR to make a post-closing adjustment and refund to Apex the difference between the Closing Book Value and $20,810,466 within 90 days of the closing. *Id.* ¶ 12. The post-closing adjustment was to be paid along with specified interest that accrued from the closing date to the date of payment. *Id.* ¶ 17.

On January 27, 1995, the transaction closed and Apex paid WSR $22,410,466. *Id.* ¶ 13. Through a series of amendments to the SPA, Apex gave WSR until September 1995 to prepare and deliver the Closing Balance Sheet. *Id.* ¶ 14. WSR delivered several different unaudited closing balance sheets for Whitlock, but never supplied the agreed-upon audited version. *Id.* ¶ 15. AMC and Cedas allege that an audited Closing Balance Sheet would have reflected a Closing Book Value at least $6,200,000 less than $20,810,466. *Id.* ¶ 16. Since the closing date, WSR has paid Apex only $1,000,000 in post-closing adjustments. *Id.*

Plaintiffs' complaint contains four counts based on the Whitlock transaction. Counts I and III claim that WSR made the following misrepresentations in the SPA and the January 27, 1995 confirming certificate. First, in Schedule 2.4(c) to the SPA, WSR inaccurately described Whitlock's Closing Book Value.

*Id.* ¶ 19a. Second, in Schedule 3.7 to the SPA, WSR inaccurately reported the profits and losses for Whitlock's stores and inaccurately described Whitlock's equity. *Id.* ¶ 19b. Third, WSR inaccurately represented in the SPA that Whitlock's condition had suffered no material adverse change between September 3, 1994 and January 27, 1995—when its stores actually had suffered a substantial reduction in sales volume during that period. *Id.* ¶ 19c. Finally, WSR inaccurately represented in the SPA that Whitlock had conducted its business consistent with past management practices between September 3, 1994 and the closing date. According to the plaintiffs, Whitlock had in reality conducted its business in a manner that improperly inflated its Closing Book Value by, *inter alia*, altering its purchasing strategy to overstate inventory and deliberately leaving some of its stores open. *Id.* ¶ 19d-e.

The misrepresentation counts also allege that WSR owed a duty to both AMC and Cedas because WSR knew and reasonably could foresee at the time of the SPA's negotiation and closing that both AMC, as Apex's general partner and fiduciary to Apex and Cedas, and Cedas would rely on WSR's representations. *Id.* ¶¶ 21–22, 38–39. Further, plaintiffs allege that AMC did reasonably rely on WSR's representations. *Id.* ¶¶ 23, 40. As a direct result of WSR's alleged misrepresentations, Apex allegedly overpaid WSR for Whitlock and WSR's agreement not to compete. *Id.* ¶¶ 25–26, 42–43. Moreover, WSR's misrepresentations allegedly caused Apex to file for bankruptcy, damaged plaintiffs' financial condition, damaged plaintiffs' interest in Apex, and caused plaintiffs to lose business and profits and suffer harm to their reputation, diminishing their value to essentially nothing. *Id.* ¶¶ 27, 44.

Counts II and IV claim that WSR committed fraud in connection with the Whitlock transaction. Plaintiffs allege that during the negotiations, WSR provided false, misleading financial information to AMC, and to Cedas and Apex through AMC, in order to induce Apex to pay an inflated amount for Whitlock and the non-compete agreement. *Id.* ¶¶ 30, 47. Specifically, plaintiffs claim that WSR knowingly provided financial information that

systematically overvalued certain assets and undervalued certain liabilities, materially increasing Whitlock's apparent value. *Id.*

The fraud counts also allege that WSR continued to provide Apex erroneous financial information after the closing in order to minimize the post-closing adjustment and to keep Apex's inflated payment. *Id.* ¶¶ 32–34, 49–51. Additionally, plaintiffs claim that WSR insisted on using Whitlock's general ledger rather than its perpetual inventory system to prepare the balance sheets, despite the fact that the general ledger had never been provided to Apex and did not contain the information needed to prepare the Closing Balance Sheet. *Id.* ¶¶ 33, 50. Plaintiffs allegedly reasonably relied on this information, as WSR allegedly knew they would. *Id.* ¶¶ 30, 35, 47, 52.

## PROCEDURAL BACKGROUND

Apex filed a complaint against WSR in the United States District Court for the Northern District of Illinois in October 1995. That complaint claimed breaches of contract and fraud arising from the Whitlock sale. In February 1996, Apex and Whitlock declared bankruptcy. The Bankruptcy Court entered an order confirming a plan of reorganization for Apex and Whitlock ("Plan") on September 24, 1996. Shortly thereafter, Apex filed an amended complaint against WSR, and pursuant to an agreement between Apex and WSR, the Apex lawsuit was referred to the Bankruptcy Court as an adversary proceeding related to Apex and Whitlock's bankruptcy cases.

Plaintiffs' complaint, which we have summarized above, was filed in Illinois state court on January 27, 1997. It was removed to this Court on February 25, 1997. Thereafter, WSR filed two motions: WSR's Motion to Dismiss Complaint and WSR's Motion to Refer Action to the Bankruptcy Court. On May 20, 1997, this Court denied WSR's motion to dismiss without prejudice and granted WSR's motion to refer the case to the Bankruptcy Court. We specifically requested the Bankruptcy Court to determine whether this

action is barred by *res judicata* to the extent it directly relates to the confirmed plan of reorganization in the Apex case and Apex's prior complaint against WSR.

On November 10, 1997, the Bankruptcy Court declined this Court's request. The Bankruptcy Court held that it lacked subject matter jurisdiction because a court cannot decide the preclusive effects of its own judgments; rather, another court must determine the effect that the first judgment has on its determinations. Based on these developments, this Court reinstated plaintiffs' complaint on November 25, 1997.

A few weeks later, WSR renewed its motion to dismiss. With the Court's permission, plaintiffs refiled pleadings previously submitted to this Court and the Bankruptcy Court to serve as their response to WSR's renewed motion to dismiss.

## LEGAL STANDARDS

WSR has moved to dismiss plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6)–(7). Dismissal under these provisions is proper only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" in the complaint. *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993) (quotations and citations omitted). In deciding whether to grant a motion to dismiss, a court must consider the factual allegations in the pleading to be true and draw all reasonable inferences in favor of the non-moving party. *Id.*

## ANALYSIS

WSR presents three arguments in support of dismissal: (1) this action is barred under the doctrine of *res judicata* because the Bankruptcy Court's order confirming the Reorganization Plan precludes it; (2) plaintiffs lack standing to sue; and (3) plaintiffs' complaint fails to name a necessary party. Because we resolve this motion on *res judicata*[1] grounds, we need not address the other two issues.

---

1. Although the term "res judicata" is sometimes used to refer to the law of former adjudication that encompasses both claim preclusion and is-

sue preclusion, we will use the term to refer only to the rules of claim preclusion.

"The doctrine of *res judicata* bars relitigation of claims that were or could have been asserted in an earlier proceeding." *D & K Properties Crystal Lake v. Mutual Life Ins.*, 112 F.3d 257, 259 (7th Cir.1997). Federal law governs our *res judicata* analysis here because the allegedly preclusive action was brought in federal bankruptcy court. *See EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1289 n. 4 (7th Cir.1993) ("Where the earlier action is brought in federal court, the federal rules of res judicata apply."); *Barnett v. Stern*, 909 F.2d 973, 977 (7th Cir.1990) (same); *In re Energy Coop., Inc.*, 814 F.2d 1226, 1230 (7th Cir.) (same), *cert. denied*, 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987). Accordingly, we will apply federal common law *res judicata* principles to determine whether plaintiffs' claims are barred by the Bankruptcy Court's order confirming the Plan. In federal court, *res judicata* bars a lawsuit if three conditions are met: 1) a court of competent jurisdiction rendered a final decision on the merits in an earlier action; 2) the second action involves the same parties, or their privies, as the earlier action; and 3) there is an identity of causes of action. *See D & K Properties*, 112 F.3d at 259.

WSR argues that the plaintiffs' complaint and the Reorganization Plan satisfy these three elements. As to the first, WSR argues that the Plan constitutes a final judgment on the merits that binds all parties. WSR next contends that under the Bankruptcy Code, the plaintiffs were parties to the Plan because they were equity holders and held partnership interests in Apex.[2] *See* 11 U.S.C. § 1141(a). Finally, WSR maintains that there is an identity of the causes of action since most of the allegations in plaintiffs' complaint are lifted verbatim from Apex's amended complaint. According to WSR, the Plan canceled plaintiffs' equity interest in Apex and assigned all rights to sue WSR over the Whitlock acquisition exclusively to Apex, which, in turn, assigned its rights to Whitlock Equity Partners, L.P. ("WEP").

**A. Provisions of the Plan**

As a threshold matter, our examination of the Plan leads us to agree with WSR's interpretation. We conclude that the Plan achieved the following: First, it nullified the plaintiffs' interests in Apex. Paragraph 8.3 "canceled, annulled and extinguished" any "existing Equity Interests"–defined as "any partnership interest"–and paragraph 4.4 forbade any distribution to them. Plan at 6, 15, 22. Plaintiffs' general and limited partnership interests in Apex meet the definition of "partnership interest" (any general or limited equity security in Apex, *see* ¶ 1.48) and, as such, were extinguished by the Plan. *See* Plan at 6, 7.

Second, the Plan vested all rights to "WSR Litigation" in Apex, and then assigned these litigation rights to Whitlock Equity Partners, LLC ("WEP"), the new equity security holder in Apex. Plan at 10, 11, 17, 21, 23. The Plan broadly defines WSR Litigation as Apex's suit then pending against WSR in the Bankruptcy Court, as well as "all other claims, rights, and causes of action against any Person (other than Carmell or Finova) arising out of or otherwise relating in any manner to the Whitlock Acquisition." *Id.* at 11. Plaintiffs contend that "WSR Litigation" includes only claims that could have been asserted by debtors absent the Plan. But the definition includes no such limitation, and we believe it is more than broad enough to encompass plaintiffs' claims, which unquestionably arise out of or relate to the Whitlock Acquisition. Additionally, plaintiffs argue that the definition was clarified at the Plan's confirmation hearing to release only claims belonging to the debtors–and that other entities' claims were reserved. However, as the Seventh Circuit in *D & K Properties Crystal Lake* explained, "to avoid res judicata[,] the reservation of a cause of action must be both express, as in writing, and express, as in specifically identified." 112 F.3d at 261. Plaintiffs do not identify any provision of the Plan that expressly reserves their claims, and we cannot interpret this oral interaction

---

**2.** WSR also premises its identity of parties contention on the assertion that David Carmell, the ex-CEO of Apex and 100% owner of AMC and Cedas, participated in and approved of the Plan.

We need not address this point, however, because we find that AMC and Cedas themselves are parties bound by the plan.

in which the plaintiffs are never even mentioned as a valid reservation.

## B. A Final Decision on the Merits

■ Viewing these provisions in conjunction with the plaintiffs' complaint, it is clear that the three elements of *res judicata* have been met. First, a bankruptcy court's confirmation of a plan of reorganization constitutes a final judgment on the merits with *res judicata* effect. *Stoll v. Gottlieb*, 305 U.S. 165, 170–71, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *D & K Properties Crystal Lake*, 112 F.3d at 259. Consequently, claims pertaining to the Plan that could have been asserted prior to its confirmation are precluded. *In re Heritage Hotel Partnership*, 160 B.R. 374, 377 (9th Cir. BAP 1993); *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 463 (6th Cir.1991); *Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 877 (2nd Cir.1991). In the instant case, the Bankruptcy Court issued an order confirming Apex and Whitlock's Plan in 1996, constituting a final judgment on the merits by a court of competent jurisdiction. Plaintiffs' claims could have been asserted well before the confirmation—the Whitlock transaction closed in January 1995 and Apex filed its complaint alleging breach of contract and fraud arising out of this transaction in October 1995. And these claims clearly pertain to the Plan; they are mentioned expressly in the Plan's definition of "WSR Litigation."

## C. Same Parties or their Privies

■ Plaintiffs argue that they were neither a party nor in privity with a party to the bankruptcy proceedings for *res judicata* purposes. They assert that the only parties to the Plan are the debtors (such as Apex) and that plaintiffs are independent third parties. However, under 11 U.S.C. § 1141(a), plaintiffs fit within the Bankruptcy Code's definition of party bound by the confirmed Reorganization Plan. Section 1141(a) provides that "the provisions of a confirmed plan bind the debtor ... and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan." 11 U.S.C. § 1141(a). The Bankruptcy Code includes in the definition of "equity security" an "interest of a limited partner in a limited partnership" and a "share in a corporation." 11 U.S.C. § 101(16)(A)–(B). An "equity security holder," in turn, is a "holder of an equity security of the debtor." *Id.* § 101(17).

As debtor Apex's general partner, AMC is expressly bound to the Plan by 11 U.S.C. § 1141(a), despite the fact that the Plan impairs its interest in Apex. AMC is also bound as an "equity security holder" because it is an Apex shareholder. Cedas is likewise bound under the Bankruptcy Code's definition of "equity security holder" because it is a shareholder of and limited partner in debtor Apex—again, despite the fact that these interests are impaired by the Plan.

■ The Sixth Circuit has made clear that a debtor's equity security holders are parties against whom a confirmed reorganization plan operates as *res judicata:*

> Other entities, such as creditors and equity security holders in the debtor, must also be considered parties for res judicata purposes.... To release creditors and equity security holders from the bonds of res judicata would allow them to launch collateral attacks on confirmed plans, undermining the necessary ability of bankruptcy courts to settle all of the claims against the debtor. To interpret the term "party" narrowly would also run counter to the provisions in the Code which outline the effect of plans and offer methods for challenging the bankruptcy orders. *See, e.g.,* 11 U.S.C. §§ 1141, 1144.

*Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 480–81 (6th Cir.1992) (citations omitted). This holding squarely applies to the plaintiffs in this case.

WSR also argues that privity exists between plaintiffs and Apex. In general, privity exists between parties who adequately represent the same legal interests. *In the matter of L & S Industries, Inc.*, 989 F.2d 929, 932 (7th Cir.1993). The Seventh Circuit states that the question of whether privity

exists is a fact-intensive determination reviewed on a sliding scale. *Id.* at 933. We cannot conclude for purposes of this motion to dismiss whether the plaintiffs are in privity with Apex. A review of Seventh Circuit authority leads us to conclude that privity likely exists between the plaintiffs and Apex; however, this determination is not appropriate at the motion-to-dismiss stage, and it is unnecessary given our ruling that plaintiffs are themselves parties bound by the Plan.

### D. An Identity of the Causes of Action

The Seventh Circuit explained that "a claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action." *Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 338–39 (7th Cir.1995). Moreover, "if the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between allegedly different causes of action." *Tice v. American Airlines, Inc.,* 959 F.Supp. 928, 934 (N.D.Ill. 1997).

■ In the instant case, plaintiffs' complaint and the Plan both address claims arising out of Apex's acquisition of Whitlock from WSR, fusing an identity of causes of action. Indeed, the factual allegations in plaintiffs' complaint and debtor Apex's complaint–an integral part of the bankruptcy proceedings–are nearly identical. Both center on WSR's alleged misrepresentations that induced Apex to overpay for Whitlock and forced Apex into bankruptcy. At the core of both complaints, then, is WSR's conduct in connection with the Whitlock sale. The fact that the Apex complaint includes some additional claims and theories of recovery is irrelevant. *See Brzostowski,* 49 F.3d at 339 (holding that earlier suit's different legal theory did not save the later action from the *res judicata* bar because "the central factual issues are identical"). Because the factual allegations in the Apex complaint are central the Reorganization Plan, the Plan bars plaintiffs' claims based on the same set of facts.

### CONCLUSION

■ When all of the requirements of claim preclusion are satisfied, the judgment in the first case acts as an absolute bar to the subsequent action with regard to every claim that was actually made or could have been presented. Put more specifically, once a bankruptcy plan is confirmed, an equity security holder cannot assert rights that are inconsistent with its provisions. Because plaintiffs could have raised their claims before the confirmation of the Plan, *res judicata* prevents their being raised now. Therefore, we hold that plaintiffs are bound by the confirmation order and that their claims are precluded under the doctrine of *res judicata.*

Accordingly, we grant WSR's motion to dismiss plaintiffs' complaint with prejudice. The Clerk of the Court is instructed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of the defendant and against the plaintiffs.